EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re:                          | 2019 TSPR 82   |
|---------------------------------|----------------|
| Hon. Jaime J. Benero García     | 202 DPR ____   |

Número del Caso: AD-2016-0001

Fecha: 1ro de mayo de 2019

Abogado de la Parte Querellada:

      Lcdo. Virgilio Mainardi Peralta
      Lcdo. José Ángel Rivera-Rodríguez
      Lcdo. Luis Manuel García Tous

Oficina de Administración de los Tribunales
Oficina de Asuntos Legales

      Lcda. Cristina Guerra Cáceres, Directora
      Lcda. Isabel Sánchez del Campo
      Lcda. Valerie Díaz Aponte
      Lcda. Rosa Cruz Niemiec

Comisión de Disciplina Judicial:

      Hon. Aída N. Molinary de la Cruz, Presidenta
      Lcda. Evelyn Benvenutti Toro
      Lcda. Lourdes Velázquez Cajigas
      Dr. Juan Salgado Morales

Materia: Ética Judicial – Archivo de querella por no demostrarse mediante prueba clara, robusta y convincente que se cometieron los cargos imputados.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. Jaime J. Benero García        AD-2016-0001        Conducta
                                                       Profesional

PER CURIAM

En San Juan, Puerto Rico, a 1 de mayo de 2019.

Reafirmamos que no procede emplear los mecanismos disciplinarios como sustitutos de los procesos de revisión judicial de las determinaciones judiciales de nuestros magistrados. Este es un imperativo del concepto de independencia judicial, que respeta la discreción de cada juez para decidir los asuntos que tiene ante su consideración. Por consiguiente, acogemos la recomendación de la Comisión de Disciplina Judicial de archivar esta Querella.

I.

A.

El 23 de febrero de 2016 la entonces Directora

Administrativa de los Tribunales, Hon. Isabel Llompart Zeno, presentó un *Informe de Investigación* sobre la conducta del Hon. Jaime J. Benero García, Juez Superior, producto de la investigación realizada por la Oficina de Asuntos Legales tras las quejas presentadas por la Sra. Nydia E. Rodríguez Santiago, la Sra. Yomarie Muriel Rodríguez, el Sr. Carlos A. Figueroa Serrano, la Sra. Leishla Cruz Rodríguez y el Sr. José Rivera Cardona, así como un referido de la Comisión de Evaluación Judicial. El *Informe de Investigación* fue acompañado por los documentos que formaron parte de la evidencia recopilada durante la investigación.

La entonces presidenta de la Comisión de Disciplina Judicial, Hon. Aida N. Molinary de la Cruz, designó al Lcdo. José Miranda De Hostos para que determinara si existía o no causa probable para presentar querella contra el juez Benero García. Luego de un análisis de los documentos y hechos presentados en el *Informe de Investigación*, el licenciado Miranda De Hostos rindió su *Informe* en el que determinó que existía causa probable para iniciar un procedimiento disciplinario contra el juez Benero García por la alegada violación de los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial, así como "por alegada inhabilidad o incompetencia profesional manifiesta en el cumplimiento de sus deberes judiciales".

El 14 de marzo de 2016 la Oficina de Administración de los Tribunales (OAT) presentó la *Querella* contra el juez

Benero García. En ésta se imputaron los siguientes seis cargos:

### PRIMER CARGO

El juez Benero incurrió en conducta incompatible con los deberes de su cargo, al no actuar de modo sereno, prudente e imparcial en el ejercicio de sus funciones judiciales y al evidenciar impaciencia y severidad excesiva, así como un trato carente de respeto y cordialidad hacia varios(as) ciudadanos(as), funcionarios(as) y abogados(as) que acudieron a su Sala de asuntos de lo criminal y de Relaciones de Familia. Al actuar ensoberbecido de poder y, en ocasiones, a base de estereotipos y prejuicios personales sin ajustarse a la evidencia que tenía en su poder, el juez Benero demostró falta de temperamento judicial, lesionando la imagen de la judicatura y la confianza del pueblo en su sistema de justicia. Ello, en claro desapego a los Cánones 1, 5, 8, 9, 13 y 14 de Ética Judicial.

### SEGUNDO CARGO

El juez Benero abusó intencionalmente de su discreción judicial al incurrir en un uso indiscriminado del mecanismo del desacato como sanción y al imponer órdenes de arresto y altas fianzas en situaciones que claramente no se justificaban o que no guardaban proporción a los hechos ocurridos, creando un ambiente de opresión, miedo e intimidación en su Sala. Al no resguardar su conducta dentro de la debida propiedad y circunspección, en claro menosprecio a los derechos fundamentales de los (las) ciudadanos(as) y a su dignidad como seres humanos, el juez Benero demostró abuso de poder y falta de sensibilidad en el manejo de los asuntos que tenía ante su consideración. De esta forma se condujo en abierta contravención a los Cánones 1, 3, 8, 13 y 14 de Ética Judicial.

### TERCER CARGO

El juez Benero incumplió con sus deberes judiciales y le negó el debido proceso de ley a las partes, en el contexto de asuntos tan sensitivos como los de Relaciones de Familia, en los cuales celebró vistas judiciales y, en ocasiones, tomó determinaciones que afectaban los derechos de dichas partes, en ausencia de sus abogados. La referida actuación atentó contra la

dignidad y el respeto que merecen todos(as) los (las) ciudadanos(as) que acuden al Tribunal en busca de justicia, a la vez que demostró falta de conocimiento del Derecho, circunspección, prudencia y temperamento judicial, conducta reñida con los Cánones 3, 8, 9, 13 y 14 de Ética Judicial.

### CUARTO CARGO

El juez Benero demostró ausencia de colaboración y cooperación en la relación profesional con sus compañeros(as) jueces y juezas. Específicamente evidenció que no tenía buena comunicación con su juez pareja en el Centro Judicial de Ponce y que solía retener a los abogados y testigos esperando por su turno en Sala, sin importarle el retraso en los procedimientos de las otras salas y el impacto que ello podría ocasionar para la sana administración de la justicia. Asi, el juez Benero vulneró la conducta que proscriben los Cánones 6 y 13 de Ética Judicial, en lo referente al trato de cordialidad y respeto que debe permear las relaciones de los jueces y las juezas entre sí y la de estos(as) con la del resto del personal que interviene en los procedimientos judiciales.

### QUINTO CARGO

El juez Benero infringió las normas administrativas que le requieren cumplir con el horario de sesión del Tribunal, al extender continuamente las horas de almuerzo y de salida del personal que tenía a su cargo, de manera reiterada e injustificada. Lo anterior, a su vez, impactó la administración de las funciones de los alguaciles, toda vez que provocó una acumulación de horas extras de trabajo como parte de sus labores de seguridad. Al conducirse de ese modo, el juez Benero violó el Canon 4 de Ética Judicial que obliga a los jueces y las juezas a cumplir cuidadosa y diligentemente las obligaciones administrativas que les imponen las leyes, los reglamentos y las normas aplicables de la Rama Judicial, así como el Canon 13 que requiere un trato considerado hacia los(las) participantes del procedimiento judicial, incluyendo los(las) funcionarios(as) del tribunal.

**SEXTO CARGO**

El juez Benero demostró un patrón de incompetencia manifiesta en sus funciones judiciales, ante la falta de temperamento judicial, impaciencia y severidad excesiva promovida contra varios(as) participantes del procedimiento judicial y funcionarios(as) de la Rama Judicial. Asimismo, dicho juez reflejó tener un pobre conocimiento del Derecho e insuficientes destrezas profesionales y capacidad de análisis para el ejercicio de su cargo. Su ausencia de vocación, aptitud e idoneidad para desempeñar la honrosa posición que ocupa, conllevó a que la Comisión de Evaluación le otorgara una evaluación de "no calificado" por sus ejecutorias. Ello, unido a que faltó a su deber de comportarse de acuerdo a los más altos estándares de respeto y civismo que se les requiere a los miembros de la Judicatura en el trato que despliegan hacia el público en general, evidencia que dicho juez infringió los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial y vulneró la confianza de la ciudadanía en su sistema de justicia.

El juez Benero García presentó su *Contestación a Querella* el 20 de abril de 2016, en que negó todos los cargos que fueron imputados y presentó varias defensas afirmativas.

Como parte del proceso de descubrimiento de prueba, la representación legal del juez Benero García solicitó a la OAT realizar entrevistas a funcionarios y empleados de la Rama Judicial, identificados como posibles testigos, a los fines de examinar el conocimiento personal de ellos en cuanto a los hechos en los que se fundamentaba la *Querella*. Ante tal solicitud, la OAT manifestó tener reparo a que la representación legal del juez Benero García tuviese acceso a entrevistar a dichos funcionarios. La OAT adujo que eso era innecesario ya que las estipulaciones propuestas surgían de documentos que obraban en los expedientes judiciales,

regrabaciones y de las declaraciones juradas que el juez Benero García tenía en su poder. Además, la OAT argumentó que el juez Benero García debía demostrar la necesidad y pertinencia que sustentaba su solicitud de deponer a empleados y funcionarios de la Rama Judicial, conforme con lo dispuesto en la Regla 20 de Disciplina Judicial. Finalmente, la Comisión autorizó a la representación legal del juez Benero García a tomar la deposición, una sola vez, de quince empleados y funcionarios de la Rama Judicial.

Inconforme con la determinación de la Comisión, la OAT recurrió ante este Tribunal Supremo mediante *certiorari* acompañado de una *Moción en auxilio de jurisdicción,* para que se revisara la decisión de la Comisión de autorizar la toma de deposiciones de los quince empleados y funcionarios. La OAT alegó que el juez Benero García no satisfizo el criterio de necesidad y pertinencia requerido por la Regla 20 de Disciplina Judicial. Mediante *Resolución* de 8 de septiembre de 2016, declaramos no ha lugar ambas solicitudes. Así las cosas, la representación legal del juez Benero García tomó las deposiciones, según autorizadas.

Como consecuencia de una controversia surgida entre las partes durante el descubrimiento de prueba, la OAT presentó ante la consideración de la Comisión una *Moción con relación a descubrimiento de prueba y en solicitud de orden protectora*. En específico, la controversia surgió debido a que el sexto cargo imputado al juez Benero García se fundamentaba, en parte, en las calificaciones obtenidas en

dos evaluaciones realizadas por la Comisión de Evaluación Judicial, y como parte del *Apéndice* del *Informe de Investigación* se hicieron formar parte documentos relacionados con estas evaluaciones. Por tal razón, la representación legal del juez Benero García solicitó, como parte del descubrimiento de prueba, evidencia adicional relacionada con los procedimientos llevados a cabo ante la Comisión de Evaluación Judicial. La OAT se opuso a ello por considerarlo impertinente al proceso disciplinario y constituir un intento de quebrantar la confidencialidad que cobija los procesos de evaluación judicial. La OAT solicitó que para salvaguardar la confidencialidad de la información, se protegiera la parte del *Apéndice* del *Informe de Investigación* que contenía la documentación confidencial relacionada con los procesos llevados a cabo ante la Comisión de Evaluación Judicial. Mediante resolución de 9 de enero de 2017, la Comisión declaró con lugar la solicitud de orden protectora de aquellas páginas del *Apéndice* del *Informe de Investigación* relacionadas con la Comisión de Evaluación Judicial y se ordenó al Secretario del Tribunal que dichas páginas fuesen selladas y reservadas como documentos confidenciales no accesibles al público.

La vista en su fondo se celebró los días 1, 2, 3 y 6 de febrero de 2017. Luego de los trámites de rigor y analizados los testimonios de los testigos presentados por la OAT, los testimonios estipulados de los testigos del juez Benero García, así como también las grabaciones de las vistas y la

prueba documental, la Comisión emitió un *Informe Final*. En este informe concluyó que la evidencia presentada por la OAT no demostró mediante prueba clara, robusta y convincente que el juez Benero García cometió los cargos imputados por violación de los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial.

Inconforme con la conclusión a la que arribó la Comisión de Disciplina Judicial, la OAT presentó una *Comparecencia en torno a la recomendación emitida por la Comisión de Disciplina Judicial, al amparo de la Regla 30(A) de las Reglas de Disciplina Judicial.* En ese escrito la OAT expresó que, contrario a lo indicado por la Comisión de Disciplina Judicial, existía prueba suficiente, robusta y convincente de que el Juez Benero García quebrantó la ética judicial con sus actuaciones. El Juez Benero García, por conducto de su representación legal, replicó a lo expuesto por la OAT. Veamos los hechos que dan margen a la querella que nos ocupa.

B.

El Hon. Jaime J. Benero García fue nombrado Juez Superior el 1 de diciembre de 2009 y juramentó en la misma fecha. Entre el 2 de diciembre de 2009 y el 20 de enero de 2010, el juez Benero García participó en el Programa de Formación Inicial de la Judicatura para Jueces y Juezas de nuevo nombramiento. Como parte de este programa se le ofrecieron adiestramientos sobre los siguientes temas: el temperamento judicial y el desacato (17 de diciembre de

2009), los Cánones de Ética Judicial (4 de enero de 2010) y la fianza (7 de enero de 2010).

El juez Benero García ha participado de adiestramientos auspiciados por la Academia Judicial Puertorriqueña sobre distintos temas. Entre el 1 de abril de 2011 y el 4 de octubre de 2013, el juez Benero García participó en cincuenta y cinco adiestramientos ofrecidos por la Academia Judicial sobre los siguientes temas: Las emociones y la memoria emocional, 25 de marzo de 2011; Procedimiento de fijación de fianza y revisión de fianza, 16 de septiembre de 2011; Taller sobre Ley 177 de 1 de agosto de 2003, Ley para el bienestar y protección integral de la niñez, 23 y 30 de septiembre y 7 de octubre de 2011; Ciclo de Derecho de Familia II: Manejo de sala, 10 de febrero de 2012; Manejo del desacato, 9 de marzo de 2012; Ciclo de Derecho de Familia IV, 1 de junio de 2012; Ley para la seguridad, bienestar y protección de menores, 25 de enero de 2013; Currículo de Familia Parte VI: Leyes 246-2011 y 186-2009, 15 de febrero de 2013; Ciclo sobre el manejo de las salas penales-criminal grave II, 8 de marzo de 2013; Ciclo sobre el manejo de las salas penales-criminal grave III, 15 de marzo de 2013. Además, el juez Benero García participó en el Programa Inicial para Jueces y Juezas de Familia entre el 18 de abril y el 31 de mayo de 2013.

En sus inicios, el juez Benero García fue asignado a la región judicial de Ponce, donde se desempeñó desde el 21 de enero de 2010 en una sala de asuntos de lo criminal menos graves, tránsito y vistas preliminares en alzada. A partir

del 18 de marzo de 2013, el juez Benero García fue asignado a una sala de relaciones de familia en el Centro Judicial de Carolina. Durante el periodo del 1 de mayo de 2015 hasta el 4 de octubre de 2016, el juez Benero García ejerció sus funciones judiciales en la sala de Carolina en Río Grande. Al presente, el juez Benero García está asignado a la región judicial de Fajardo, sala de Río Grande.

C.

La Sra. Nydia E. Rodríguez Santiago tenía la custodia de su hijo y era la parte demandada en el caso <u>Arles Pages Ramírez v. Nydia Rodríguez Santiago</u>, FCU2011-0100, sobre relaciones paterno filiales. Durante los años 2013-2014, la señora Rodríguez Santiago compareció a varias vistas celebradas ante el juez Benero García. Para la fecha en que se celebró la vista que dio origen a la queja presentada por la señora Rodríguez Santiago, esta era representada por el Lcdo. Javier Pérez Rojas. La señora Rodríguez Santiago no estaba satisfecha con las gestiones que realizaba el licenciado Pérez Rojas como parte de su representación porque no asistía a las vistas, además de que no preparaba las mociones que ella le solicitaba para hacer constar ciertas situaciones que alegó que ocurrían con el padre de su hijo y así oponerse a que el padre se relacionara con el niño.

Como parte de las incidencias del caso, la señora Rodríguez Santiago interesaba solicitar que se revisara el estudio social que se había preparado en el caso, porque

ella no estaba conforme con la recomendación de que se ampliaran las relaciones paterno filiales. A su modo de ver las cosas, el niño podría correr peligro. En febrero de 2012, el juez Benero García acogió las recomendaciones del informe social y estableció cómo debían llevarse a cabo las relaciones paterno filiales entre el Sr. Arles Pages Ramírez y su hijo. Además, ordenó a las partes comparecer a un proceso psicoterapéutico. El 2 de agosto de 2012, la representación legal del señor Pages Ramírez presentó una *Moción en solicitud de desacato*, y adujo que en ocasiones no podía llevarse a su hijo conforme lo establecido para las relaciones paterno filiales. Nuevamente, el 22 de octubre de 2012 la parte demandante presentó una *Moción informativa* en que alegó que no pudo ejercer su derecho de relaciones paterno filiales porque supuestamente el niño se encontraba enfermo. Luego, el 6 de diciembre de 2012, la representación legal del señor Pages Ramírez presentó *Moción urgente en solicitud de remedios* en la que alegó que la señora Rodríguez Santiago incumplió con las órdenes del Tribunal en cuanto a exponer su posición sobre mociones presentadas por la parte demandante. Posteriormente, el 11 de junio de 2013 la parte demandante presentó otro escrito titulado *Moción informativa y en solicitud urgente de remedios*. En este escrito reclamó lo mismo de los escritos anteriores. Incluso, durante el proceso de epígrafe surgió que el señor Pages Ramírez llegó a presentar una querella en la Policía porque la señora

Rodríguez Santiago no cumplía con las relaciones paterno filiales.

Así las cosas, en una vista celebrada el 11 de julio de 2013, el representante legal de la señora Rodríguez Santiago informó que solicitaría la actualización del informe social para luego estructurar un plan de relaciones paterno filiales. Este informe de la trabajadora social recomendaba la ampliación de las relaciones paterno filiales. Ese día, el juez Benero García determinó referir el caso a la Unidad de Trabajo Social para que se actualizara el informe social y, a su vez, se determinara cómo se llevarían a cabo las relaciones filiales. Posteriormente, en una vista celebrada el 27 de agosto de 2013, la señora Rodríguez Santiago fue citada en corte abierta para la siguiente audiencia, a celebrarse el 17 de octubre de 2013 a las 9:00 am. De su testimonio ante la Comisión de Disciplina Judicial, la señora Rodríguez Santiago declaró que era consciente que su citación era específicamente para ese día y hora.

El 17 de octubre de 2013, cuando el caso fue llamado para dar inicio a la vista, se le informó al juez Benero García que el licenciado Pérez Rojas se había comunicado en la mañana para notificar los motivos para su retraso en llegar a sala y solicitar un turno posterior, el cual le fue concedido. También el alguacil de sala, Sr. Jaime Rosario Gutiérrez, hizo constar que la señora Rodríguez Santiago no había comparecido ni se había comunicado durante la mañana para excusarse. Ante tal situación, el caso fue dejado para

un turno posterior. Cuando el caso fue llamado posteriormente, se le informó al juez Benero García que el licenciado Pérez Rojas no había vuelto a comunicarse durante el transcurso de la mañana, ni cercano al mediodía, para informar si venía de camino o si continuaba retrasado y que la señora Rodríguez Santiago tampoco se había comunicado. Ese día no había casos señalados para la tarde. Surge de la Minuta-Resolución que, ante esa incomparecencia, el juez Benero García ordenó el arresto de la señora Rodríguez Santiago por desacato criminal y le impuso una fianza de diez mil dólares. Además, impuso al licenciado Pérez Rojas una sanción de quinientos dólares por su incomparecencia. También el juez Benero García determinó acoger, de forma provisional, las recomendaciones del informe social que, tras su actualización, nuevamente recomendaba ampliar las relaciones paterno filiales.

En cuanto a lo ocurrido ese día, la señora Rodríguez Santiago expresó que, aunque fue citada para las 9:00 am, salió temprano a realizar unas diligencias. Con posterioridad, recibió una llamada de su papá en la que le informó que el licenciado Pérez Rojas llamó para indicarle que debía presentarse al tribunal ya que él había notificado que se encontraba en el hospital con su hijo, pero habría de comparecer. Entonces, la señora Rodríguez Santiago se dirigió al tribunal de Carolina y llegó a sala luego de las 11:00 am. Al llegar a la puerta de la sala se asomó, pero no entró, ni tampoco habló con el alguacil. Allí observó que

se encontraban en sala el juez Benero García, el alguacil y una señora. La señora Rodríguez Santiago decidió ir al estacionamiento a buscar a su abogado para que entrara a sala junto a ella. En el pasillo se encontró con el licenciado Pérez Rojas y entraron juntos a la sala del juez Benero García. Tan pronto entró a sala, el alguacil Rosario Gutiérrez le informó que estaba bajo arresto por no haber comparecido a la vista. En el momento en que se realizó el arresto ya había concluido la sesión y el juez Benero García no se encontraba en sala. El alguacil Rosario Gutiérrez decidió realizar la detención de la señora Rodríguez Santiago aún sin que se hubiera expedido por escrito la orden de arresto en la cual se imponía la fianza. Esa orden expedida por escrito era necesaria para dar paso a los procesos de certificación de diligenciamiento, constancia de advertencias por parte de un magistrado, aceptación de consignación de fianza por parte de algún magistrado y orden de excarcelación.

Según testificó la señora Rodríguez Santiago, al momento de su arresto no se le ofreció información sobre su fianza, ni se le entregó documento alguno. De la orden de arresto emitida ese día por el juez Benero García, surge que la fianza que se le impuso finalmente ascendió a quinientos dólares sin derecho al diez por ciento (10%). Al momento de su arresto, la señora Rodríguez Santiago tenía en su cartera un dólar junto a otros objetos personales.

Previo al receso del almuerzo, la Sra. María Jiménez Seda, secretaria jurídica del juez Benero García, redujo a escrito la orden de arresto, la que fue firmada por este, remitiéndose inmediatamente a la secretaría del tribunal para el correspondiente proceso de sellos y expedición y su posterior remisión a la Unidad de Citaciones y Arrestos del tribunal. Finalmente, los familiares de la señora Rodríguez Santiago hicieron las gestiones para prestar la fianza de quinientos dólares. La señora Rodríguez Santiago permaneció en la celda del tribunal hasta alrededor de las 5:00 pm.

La próxima vista en el caso se celebró el 27 de diciembre de 2013. Para ese momento ya el juez Benero García conocía de la queja presentada por la señora Rodríguez Santiago en la OAT. Iniciada la sesión, el licenciado Pérez Rojas ofreció excusas por su incomparecencia a la vista anterior y explicó las razones por las que no había llegado a tiempo ese día. El juez Benero García determinó dejar sin efecto la sanción impuesta al licenciado Pérez Rojas y ordenó el archivo del desacato criminal impuesto a la señora Rodríguez Santiago. Ese mismo día, el licenciado Pérez Rojas solicitó que se le relevara de la representación legal como consecuencia de la queja presentada por su cliente contra el juez Benero García. Asimismo, la señora Rodríguez Santiago presentó por derecho propio una moción solicitando la inhibición del juez Benero García. Luego de examinar una copia de la moción, el juez Benero García relevó al licenciado Pérez Rojas de la representación legal, concedió

un término de treinta días para anunciar nueva representación legal y refirió la solicitud de inhibición al Juez Administrador, entre otras cosas.

D.

Otra queja contra el juez Benero García fue presentada por la Sra. Yomarie Muriel Rodríguez, quien era la parte demandante en el caso Yomarie Muriel Rodríguez v. Jonathan Olmo Soto, FAL-2012-0796. La Lcda. Lilliana Morell Bergantiños representaba a la señora Muriel Rodríguez en este caso.

Surge de la regrabación de la vista celebrada en ese caso el 19 de junio de 2014, que en una audiencia anterior se expidió una orden de mostrar causa contra la señora Muriel Rodríguez, que se le encontró incursa en desacato y que la orden de arresto quedó pendiente para ejecutarse ese día. En ese momento, la señora Muriel Rodríguez adeudaba la cantidad de $2,207.00 por concepto de pensión alimentaria. Iniciada la vista, la licenciada Morell Bergantiños presentó un certificado médico expedido el 3 de abril de 2014 por el Dr. Juan C. Rivera, en que hacía constar que la señora Muriel Rodríguez estaba bajo su cuidado médico prenatal, que tenía un embarazo de alto riesgo y que estaba incapacitada de trabajar desde el 18 de diciembre de 2013 hasta su fecha de parto, el 2 de agosto de 2014. Enfatizó la licenciada Morell Bergantiños que por tal razón su cliente no podía trabajar.

El juez Benero García preguntó a la licenciada Morell Bergantiños si el médico se encontraba en sala y por qué esa

evidencia no se presentó durante la vista anterior. La licenciada Morell Bergantiños le solicitó que determinara si era necesario que el doctor compareciese y añadió que el documento no se había presentado porque su cliente tuvo que solicitarlo ya que no lo tenía disponible. La licenciada Morell Bergantiños planteó al juez Benero García que procedía tomar en consideración la certificación médica porque traer al médico sería oneroso para su cliente. El juez Benero García cuestionó a la licenciada Morell Berngantiños por qué no le solicitó que ordenara al doctor comparecer al tribunal y esta indicó que, de este considerar que el certificado médico no podía admitirse en evidencia, que ordenara al médico comparecer al tribunal antes de emitir su determinación en cuanto a la orden de arresto contra su cliente. Es preciso señalar que la presentación del certificado médico se hizo con el propósito de lograr que la señora Muriel Rodríguez fuese excusada de su obligación, como madre no custodia, de aportar al sostenimiento de su hijo.

La abogada de la parte demandada, el padre que tenía la custodia del hijo, insistió en que la señora Muriel Rodríguez debía cumplir con lo ordenado en la vista anterior, que era pagar la cantidad de dos mil doscientos siete dólares. El juez Benero García preguntó si la señora Muriel Rodríguez había traído alguna cantidad de dinero para aportar al total adeudado a lo que la licenciada Morell Bergantiños contestó en la negativa. En ese momento, el juez Benero García declaró

la deuda líquida, vencida y exigible, y ordenó la ejecución de la orden de arresto. Añadió que si la licenciada Morell Bergantiños entendía que era necesario que el médico compareciera, debió solicitarle al tribunal que fuese citado, porque el certificado médico constituía prueba de referencia. Asimismo, añadió que de haberlo solicitado él lo habría ordenado y en esas circunstancias su cliente no hubiese tenido que pagar por la comparecencia del médico. Indicó el juez Benero García que la licenciada Morell Bergantiños no le informó esa situación y que la señora Muriel Rodríguez tampoco pagaba la pensión alimentaria de forma consecuente.

Después de este intercambio, el juez Benero García hizo referencia a unas alegadas situaciones que pasaban con la señora Muriel Rodríguez y que eran de conocimiento de la licenciada Morell Bergantiños. Las expresiones realizadas por el juez Benero García eran producto del deterioro físico y desnutrición de la señora Muriel Rodríguez que el Juez observó. Añadió que la criatura iba a estar mejor protegida en la Administración de Corrección que en la calle, por lo que ordenaría que se realizara una evaluación física completa por tener un embarazo de alto riesgo y se le proveyeran todos los servicios de salud necesarios para preservar la salud de la criatura y de la señora Muriel Rodríguez. A estos fines emitiría una orden inmediata dirigida a la Administración de Corrección, la cual iría acompañada de la orden de arresto.

La licenciada Morell Bergantiños solicitó al Tribunal que permitiera a la señora Muriel Rodríguez salir en libertad mediante el pago del diez por ciento (10%) del total adeudado para que los familiares pudieran hacer gestiones para ayudarla. Por el contrario, la abogada del demandado solicitó al tribunal que impusiese quinientos dólares, como mínimo. Luego, el juez Benero García preguntó a la licenciada Morell Bergantiños cómo estaba la situación de la adicción de su cliente, a lo que ella contestó que bien, que a su entender ella no tenía ese problema. Mientras en la regrabación de la vista se escucha a la señora Muriel Rodríguez sollozando y diciendo: "yo no sé de dónde sale eso". Nuevamente, el juez Benero García preguntó a la licenciada Morell Bergantiños si la señora Muriel Rodríguez tenía algún problema de adicción y ella contestó que desde que la conocía y la trataba, no. Después, procedió el juez Benero García a preguntar al demandado, quien le expresó que no le constaba. Comoquiera, el juez Benero García indicó que la Administración de Corrección la evaluara y se realizaran todas las pruebas para proteger la seguridad de la criatura.

Entre las estipulaciones alcanzadas entre la OAT y la representación legal del juez Benero García se hizo constar que la secretaria de servicios a sala, señora Santiago Ortiz, y el alguacil Rosario Gutierrez hubiesen testificado en cuanto a la impresión que la apariencia física de la señora Muriel Rodríguez generó en ellos durante el desarrollo del proceso judicial.

Surge del expediente que el juez Benero García expresó lo siguiente, en cuanto a que la señora Muriel Rodríguez deambulaba:

Juez Benero García:   ¿La vez pasada usted me había dicho que era deambulante, licenciada? ¿En algún momento? ¿No? ¿Dónde vive ella… dónde vive ella?

Lcda. Morell Bergantiños:   No, no, no… Bueno la dirección exacta de ella no la sé, pero puedo preguntarle.

Juez Benero García:   Vamos a preguntarle.

Lcda. Morell Bergantiños:   Yomarie…        ¿puedo preguntarle?

Juez Benero García:   Seguro.

Lcda. Morell Bergantiños: Yomarie, dí alto tu dirección. La dirección tuya.

Sra. Muriel Rodríguez: Carretera 20, kilómetro 4.5 en Guaynabo.

Juez Benero García:   ¿Con quién usted vive ahí dama?

Sra. Muriel Rodríguez:   Sola.

Juez Benero García:   ¿Y cómo paga esa casa?

Sra. Muriel Rodríguez:   Sección 8.

Juez Benero García:   Bien. Que se le hagan todas las pruebas, todas, todas las pruebas, para garantizar que el bebé este bien.

Informe de la Comisión de Disciplina Judicial, págs. 25-26.

Finalmente, el juez Benero García determinó una fianza de quinientos dólares para que la señora Muriel Rodríguez pudiese salir en libertad.

En vistas anteriores celebradas en este caso entre abril y agosto de 2013, el juez Benero García había autorizado que se ampliaran las relaciones materno filiales,

tras acoger tanto los acuerdos de las partes como el informe social. En ambas vistas, el juez Benero García también había encontrado incursa en desacato a la señora Muriel Rodríguez por incumplir con el pago de la pensión alimentaria. Durante su testimonio ante la Comisión de Disciplina Judicial, la señora Muriel Rodríguez expresó que el día de la vista ante el juez Benero García se sentía agotada ya que se encontraba en su séptimo mes de embarazo. Aclaró que no deambulaba e informó la dirección de la casa donde residía.

### E.

El Sr. Carlos A. Figueroa Serrano también presentó una queja contra el juez Benero García. Esta tuvo su origen en una orden de arresto expedida en su contra por incumplir con los pagos de pensión alimentaria como parte del caso Ana I. Cirilo Ramos v. Carlos A. Figueroa Serrano, FAL2010-0730. Para aclarar lo ocurrido con el señor Figueroa Serrano es menester realizar un relato del trasfondo fáctico de ese caso.

La representación legal de la Sra. Ana I. Cirilo Ramos presentó la reclamación de alimentos el 9 de agosto de 2010, en beneficio de sus cuatro hijos menores. El señor Figueroa Serrano se representaba a sí mismo en ese caso. En una vista celebrada el 10 de septiembre de 2010 ante el Examinador de Pensiones Alimentarias, y a la que el señor Figueroa Serrano compareció por derecho propio, se recomendó fijar una pensión provisional por la cantidad de $300.00 a ser pagada a través de la Administración de Sustento de Menores (ASUME).

Además, se notificó a las partes que la vista para determinar la pensión alimentaria regular se llevaría a cabo el 30 de noviembre de 2010.

El día en que se celebró la vista sobre fijación de pensión alimentaria, esta comenzó sin la presencia del señor Figueroa Serrano. Allí la representación legal de la parte demandante informó al Examinador de Pensiones Alimentarias que el señor Figueroa Serrano no había contestado el interrogatorio que se le había cursado. El Examinador de Pensiones Alimentarias hizo constar en su Informe sobre Pensión Alimentaria, que el señor Figueroa Serrano compareció al tribunal más tarde de la hora señalada y alegó que no había recibido el interrogatorio cursado por la parte demandante, razón por la cual informó cuál era su dirección postal. Por tal razón, se señaló nuevamente la vista de alimentos para el 22 de febrero de 2011.

La vista para la fijación de pensión tuvo que ser reseñalada, a solicitud del abogado de la parte demandante, ya que el señor Figueroa Serrano no había contestado el interrogatorio. Por su parte, el señor Figueroa Serrano alegó que no lo había recibido e informó nuevamente su dirección postal. Ante dicha situación, el Examinador de Pensiones Alimentarias determinó que la vista de alimentos se celebraría el 9 de junio de 2011. Durante esta vista, el señor Figueroa Serrano tampoco solicitó crédito alguno por el periodo, aunque luego alegó tener la custodia de sus cuatro hijos. Posteriormente, la representación legal de la

señora Cirilo Ramos presentó el 30 de septiembre de 2013 una *Moción urgente solicitando se encuentre al demandado incurso en desacato*, en la que reclamó que existía una deuda por concepto de pensión alimentaria.

El 13 de marzo de 2014 se celebró una vista de desacato ante el juez Benero García, a la que el señor Figueroa Serrano compareció por derecho propio. De la minuta surge que el tribunal acreditó al balance adeudado, unos pagos realizados por el señor Figueroa Serrano directamente a la demandante, por lo que se redujo parte del total de la deuda. Además, el señor Figueroa Serrano notificó que fue despedido de su empleo por lo que el juez Benero determinó referir el asunto a la Oficina de la Examinadora de Pensiones Alimentarias para que se evaluara tanto la solicitud de revisión, como la deuda y el retroactivo reclamado por la señora Cirilo Ramos. Añadió el señor Figueroa Serrano que había realizado pagos adicionales, pero no se le había entregado recibo. En esta vista, el señor Figueroa Serrano alegó, por vez primera, que tuvo la custodia de sus hijos por un año y medio, a lo que el juez Benero García hizo constar que no surgía del expediente que ello fuera autorizado por el tribunal. Antes de esa fecha, el señor Figueroa Serrano no demostró que hubiese realizado reclamo para que se le reconociera algún periodo en que tuvo la custodia de sus hijos ni que se le adjudicara un crédito por ese concepto. Aclaró el abogado de la demandante que anteriormente se había presentado un caso de custodia, que

se le concedió de forma provisional al señor Figueroa Serrano ante unas alegaciones de maltrato, pero luego la custodia de los menores le fue devuelta a la madre y el caso fue archivado. Añadió que la demanda de alimentos que estaba ante la consideración del juez Benero García se había presentado en el año 2010, luego de haberle sido devuelta la custodia a la madre. Finalmente, el juez Benero García declaró la deuda por concepto de pensión alimentaria, ascendente a $5,560.00 como líquida, vencida y exigible y determinó que el señor Figueroa Serrano debía satisfacer la cantidad de $2,279.90 para salir en libertad.

La vista sobre modificación de pensión alimentaria se celebró el 29 de abril de 2014. En esa ocasión, la Examinadora de Pensiones Alimentarias recomendó declarar no ha lugar la solicitud de modificación de pensión. Durante esta vista el señor Figueroa Serrano tampoco solicitó crédito alguno por el periodo en que tuvo la custodia de sus hijos. Posteriormente, el juez Benero García aceptó la recomendación de la examinadora y declaró no ha lugar la modificación de pensión.

En la vista de seguimiento celebrada el 11 de junio de 2014, a pesar de haber sido requerido por el juez Benero García que compareciera con abogado, el señor Figueroa Serrano volvió a representarse por derecho propio. Alegó que no contaba con los recursos económicos para contratar abogado, que había realizado gestiones para conseguir asistencia legal, pero fueron denegadas y que prefería

utilizar ese dinero para pagar la pensión alimentaria. El juez Benero García expresó que le había advertido que debía comparecer acompañado de abogado y le cuestionó si él era consciente de ello, a lo que el señor Figueroa Serrano contestó en la afirmativa. El abogado de la parte demandante informó al juez Benero García que, tras ser encontrado incurso en desacato civil y ordenarse su arresto, el señor Figueroa Serrano había pagado el balance adeudado. No obstante, añadió que este había vuelto a incumplir con los pagos subsiguientes. Además, solicitó que el caso fuese referido para revisión por haber transcurrido más de tres años desde que se estableció la pensión. Por su parte, el señor Figueroa Serrano alegó que realizó pagos en efectivo de los que no tenía recibos y que había abonado cierta cantidad en la vista anterior. Informó que ese mismo día había depositado una cantidad en la cuenta de banco de la demandante, mostrando un recibo del banco.

A su vez, el señor Figueroa Serrano solicitó al juez Benero García que tomara conocimiento del caso FCU2005-0162, en el que alegaba que se dispuso que los menores estuvieran bajo su custodia, y volvió a solicitar que se le acreditara dicho periodo ya que la madre no realizó pago alguno de pensión. Ante dicho planteamiento, el juez Benero García ordenó que se localizara el expediente de ese caso. Recibidos los expedientes, el juez Benero García decretó un receso y solicitó al señor Figueroa Serrano que buscara los documentos a los que hacía referencia. El señor Figueroa

Serrano expresó que, en ese momento, se sintió nervioso por la forma en que se le llamó la atención. Por su parte, tanto el alguacil Rosario Gutiérrez como la Sra. Jessmarie Santiago Ortiz, secretaria de servicios a sala, indicaron que en múltiples ocasiones el señor Figueroa Serrano intentó interrumpir al juez Benero García y en otras en efecto lo interrumpió, mientras el juez se dirigía a él o al abogado de la parte contraria.

Al reiniciar la sesión se le preguntó al señor Figueroa Serrano si había localizado los documentos, a lo que respondió que no había tenido suficiente tiempo para buscar porque se trataba de varios tomos. A juicio de la señora Santiago Ortiz, secretaria de servicios a sala, el señor Figueroa Serrano tuvo a su disposición tiempo suficiente para revisar el expediente judicial del caso sobre relaciones filiales que le fue provisto por instrucciones del juez Benero García.

Durante la vista, a preguntas del juez Benero García, la demandante informó que los menores sí estuvieron bajo la custodia del señor Figueroa Serrano por un periodo de trece meses. Tanto en esa vista como en la anterior, el juez Benero García aclaró al señor Figueroa Serrano que si no presentaba dicha evidencia no concedería el crédito solicitado. Declaró el señor Figueroa Serrano que su planteamiento ante el juez Benero García consistía en que, si se tomaba en consideración que la señora Cirilo Ramos no había realizado pago alguno por concepto de pensión alimentaria durante el tiempo que

tuvo la custodia de los menores y unos recibos de pagos realizados que alegaba tener, tenía la pensión al día.

El juez Benero García hizo constar que el señor Figueroa Serrano debía comparecer representado por abogado a la próxima vista y que ese día se atendería la controversia en cuanto a la deuda retroactiva reclamada por la señora Cirilo Ramos. También determinó que, aun tomando en consideración otra evidencia que había llevado el señor Figueroa Serrano, existía una deuda de pensión alimentaria ascendente a $3,369.90, la que fue declarada vencida, líquida y exigible. Por tal razón, encontró al señor Figueroa Serrano incurso en desacato civil y ordenó su arresto por incumplir con los pagos de pensión. Inicialmente el juez dispuso que debía pagar mil dólares para salir en libertad, sin embargo, en la minuta de ese día se hizo constar que, en cámara, finalmente determinó que sería $370.00.

Como consecuencia de estos incidentes en sala, el señor Figueroa Serrano solicitó la inhibición del juez Benero García. Mediante Resolución de 5 de septiembre de 2014, el juez Benero García expuso los fundamentos para no inhibirse del caso, y refirió el asunto ante la consideración del juez administrador Pérez Ocasio. Finalmente, el juez administrador Pérez Ocasio declaró no ha lugar dicha solicitud mediante Resolución de 23 de septiembre de 2014, en la que concluyó que las alegaciones del señor Figueroa Serrano no eran suficientes para concluir que el juez Benero García actuó de forma parcializada o lo haría en el futuro.

El señor Figueroa Serrano decidió presentar una queja contra el juez Benero García. Consideró el señor Figueroa Serrano que las dos ocasiones en las que se ordenó su arresto, no se le permitió expresarse y presentar los documentos que, a su juicio, demostraban que cumplía con los pagos de pensión alimentaria. No obstante, el señor Figueroa Serrano expresó que no había notificado al tribunal que tuvo la custodia de sus hijos. Además, se le preguntó cuál era el documento que buscaba en los expedientes que le fueron traídos para su revisión, pero no supo contestar.

F.

La Sra. Leishla Cruz Rodríguez también presentó una queja contra el juez Benero García, quien presidía el caso de relaciones paterno filiales y alimentos en que ella era la parte demandada. La hija de la señora Cruz Rodríguez, producto de una relación con el Sr. Miguel Ramos, no fue reconocida inicialmente a pesar de haberse realizado pruebas de paternidad después de nacida la niña. El señor Ramos residía en los Estados Unidos continentales y durante los primeros cinco años de vida de la niña, solo la vio en dos ocasiones y no mantenía contacto con ella.

No fue hasta varios años después que el señor Ramos reconoció a la niña, tras iniciarse un proceso ante la ASUME para establecer la pensión alimentaria. Para mayo de 2013, el señor Ramos presentó ante el Tribunal de Primera Instancia una petición de relaciones paterno filiales. Para ese momento, ya la niña tenía cinco años y a la persona que

reconocía como su figura paterna era el compañero sentimental de la señora Cruz Rodríguez. La señora Cruz Rodríguez exteriorizó un grado de resentimiento por la falta de interés inicial del señor Ramos en reconocer a la niña.

El señor Ramos solicitó al tribunal que se estructuraran las relaciones paterno-filiales, tras intentar infructuosamente establecer una relación con la niña. A esos fines, el Tribunal de Primera Instancia ordenó que se realizara un estudio social y fijó una vista para el 3 de septiembre de 2013, a la que la señora Cruz Rodríguez no compareció. Por ello, el tribunal emitió una orden de arresto en su contra por desacato criminal e impuso una sanción de quinientos dólares. Dicha orden de arresto fue dejada sin efecto posteriormente y se señaló una vista para el 22 de octubre de 2013. La señora Cruz Rodríguez tampoco contestó la petición de relaciones paterno-filiales, por lo que se le anotó la rebeldía.

El Tribunal de Primera Instancia ordenó que para el periodo navideño de 2013, la niña viajara a relacionarse con su padre. Sin embargo, debido al patrón de incumplimiento de la señora Cruz Rodríguez con respecto al derecho del padre de relacionarse con su hija, el tribunal dispuso que correspondería a ella pagar los gastos de viaje. En dicha ocasión, la señora Cruz Rodríguez no viajó al continente, por lo que la niña no se relacionó con su papá.

El 11 de julio de 2014, la representación legal de la señora Cruz Rodríguez presentó una petición de *certiorari*

junto a una *Moción urgente en auxilio de jurisdicción*, en que solicitó la revocación de una resolución emitida el 19 de febrero de 2014 por el juez Benero García. En ella se ordenaba que la niña viajara a Estados Unidos continentales a relacionarse con su padre biológico, al cual la niña no conocía como su padre. El Tribunal de Apelaciones, ante la inminencia del viaje, determinó paralizar los efectos de la orden, para examinar con detenimiento el caso, así como las alegaciones de las partes y los informes sociales y periciales que se habían presentado. Por tal razón, en esa ocasión la niña no viajó a visitar a su padre.

Del relato realizado en la sentencia del Tribunal de Apelaciones de 26 de agosto de 2014, surge que la trabajadora social asignada tuvo que solicitar auxilio al Tribunal de Primera Instancia para que se obligara a la señora Cruz Rodríguez a comparecer a las citas, ya que no lo hacía. Añadió el Tribunal de Apelaciones, que la señora Cruz Rodríguez había alegado que no podía ausentarse de su trabajo para realizar el viaje para acompañar a su hija, pero había omitido informar que trabajaba para su propia madre, lo que la colocaba en una posición de más flexibilidad ante la solicitud de ausentarse de su trabajo. La señora Cruz Rodríguez tampoco compareció al Taller de Madres y Padres para Siempre, según ordenado por el Tribunal de Primera Instancia, ni ofreció excusas. Añadió que en una vista celebrada el 25 de junio de 2014, el juez Benero García dispuso que la niña saldría sola con su padre a compartir

varias horas, so pena de desacato civil. Sin embargo, la señora Cruz Rodríguez llevó tarde a la niña al lugar donde se encontrarían y permaneció allí junto a ella, incumpliendo de esta forma con lo ordenado por el Tribunal de Primera Instancia e impidiendo que se llevaran a cabo las relaciones paterno-filiales.

Conforme hizo constar en su sentencia el Tribunal de Apelaciones, la señora Cruz Rodríguez alegaba ante el Tribunal de Primera Instancia que era necesario que la niña iniciara un proceso terapéutico antes de viajar, para que pudiese entender que su padre era el señor Ramos en lugar de su compañero sentimental. No obstante, para el Tribunal de Apelaciones ese proceso era el que el Tribunal de Primera Instancia había intentado establecer y ella lo obstaculizaba. Reseñó el Tribunal de Apelaciones, como preocupante, la indiferencia de la señora Cruz Rodríguez a las órdenes del tribunal y a los compromisos contraídos tanto con el tribunal como con la otra parte, amén de su desapego a la narración de los hechos de forma clara y verdadera. Tras examinar los autos del caso y los alegatos de las partes, el Tribunal de Apelaciones concluyó que el juez Benero García manejó el caso con prudencia y sabiduría y que la señora Cruz Rodríguez, sin duda, obstaculizó que se pudieran establecer las relaciones paterno-filiales, lo que era inaceptable. Por esa razón confirmó la resolución recurrida.

El 17 de octubre de 2014, se celebró una vista ante el juez Benero García en que nuevamente ordenó que la niña viajara a visitar a su papá y prohibió que la señora Cruz Rodríguez acompañara a la menor. La señora Cruz Rodríguez se oponía a que la niña viajara sola porque ella no mantenía relación alguna con el señor Ramos. Alegaba, además, que la recomendación de la sicóloga era que la niña no viajara sola, pero a pesar de dicha recomendación la determinación del juez Benero García fue que la niña viajara sola o con un acompañante que no fuera la señora Cruz Rodríguez.

Días antes del viaje, y por encontrarse el juez Benero García de vacaciones, se celebró una vista de emergencia el 21 de noviembre de 2014 ante la juez Arlene De la Matta, tras presentarse una *Moción en solicitud de orden* relacionada con el viaje de la niña en noviembre. En dicha vista, la juez De la Matta enmendó la Orden emitida por el juez Benero García y determinó que la niña no debía viajar sola y, en caso de que la señora Cruz Rodríguez no pudiese viajar, tenía que buscar un acompañante. También dispuso que la niña se quedaría donde se quedara ella o su acompañante y además apercibió a la señora Cruz Rodríguez a cumplir con lo dispuesto. La señora Cruz Rodríguez viajó junto a la niña. En el continente, la niña no llegó a relacionarse con su papá por diferencias surgidas entre la señora Cruz Rodríguez y el señor Ramos. Por esa razón, regresaron a Puerto Rico sin que la niña pudiese reunirse con su papá, a pesar de lo que el tribunal había ordenado.

El 11 de diciembre de 2014 la representación legal del señor Ramos presentó una moción para que se encontrara incursa en desacato a la señora Cruz Rodríguez. El señor Ramos hizo un relato de los eventos suscitados durante el viaje de la niña al continente. Para atender dicho incidente, se celebró una vista el 19 de diciembre de 2014 que fue presidida por el juez Benero García. Este acogió las recomendaciones de la psicóloga y la trabajadora social que evaluaron a la niña. En aquel entonces, la recomendación de la psicóloga y la trabajadora social fue que la niña no debía viajar fuera de Puerto Rico para ver a su padre biológico, porque no estaba en un estado emocional estable. Por tal razón, el tribunal determinó que la menor no viajaría por el momento y ordenó que las relaciones paterno-filiales se establecieran por la vía telefónica.

Posteriormente, se celebró una vista de seguimiento el 27 de febrero de 2015, en que el señor Ramos solicitó nuevamente que la niña viajara a visitarlo, a lo que la señora Cruz Rodríguez se opuso indicando que la niña no se encontraba preparada emocionalmente. Además, se informó al tribunal, entre otros asuntos, que las comunicaciones por la vía telefónica entre el señor Ramos y la niña no se habían logrado establecer. Entonces, determinó el juez Benero García dejar sin efecto los acuerdos establecidos en la vista anterior como consecuencia de que las partes no se lograban poner de acuerdo y la niña continuaba sin entablar una

relación con su padre biológico y que la niña tampoco recibía tratamiento psicológico.

El 12 de marzo de 2015 se celebró una vista ante el juez Benero García a la que la señora Cruz Rodríguez compareció sin su representación legal, la Lcda. Angely M. Luna, quien no pudo asistir por problemas de salud. En la vista estaban presentes la representación legal del señor Ramos, la señora Cruz Rodríguez y la Sra. Carmen R. De Jesús, trabajadora social del caso. Al inicio, el juez Benero García expresó que la vista no sería de naturaleza argumentativa sino informativa, porque no estaba presente la representación legal de la señora Cruz Rodríguez. Como parte de la vista, el juez Benero García discutió el caso con la trabajadora social De Jesús, quien hizo constar que su recomendación era que se iniciara un proceso terapéutico para que la niña conociera al señor Ramos como figura paterna, de forma gradual, ya que ella nunca se había relacionado con él y a quien reconocía como su papá era al compañero sentimental de su mamá. Luego de discutir el caso con la trabajadora social De Jesús, el juez Benero García emitió una resolución en corte abierta, en la que ordenó, entre otras cosas, que la niña viajara a visitar a su papá y que la señora Cruz Rodríguez no la acompañaría, sino que debía conseguir un acompañante cuyos gastos serían sufragados por ella. Advirtió a la señora Cruz Rodríguez que, de interponerse y no cumplir con las relaciones-paterno filiales, celebraría una vista para entregar la custodia de

la niña al señor Ramos, por ella obstruir las relaciones paterno filiales. Según la señora Cruz Rodríguez, no era la primera vez que el juez Benero García le hacía dicha advertencia. Al momento en que el juez Benero García emitió su dictamen, en el cual autorizó el viaje de la menor, se encontraba en sala la trabajadora social De Jesús, quien no hizo constar reparo con dicha determinación. Fue después de esta vista que la representación legal de la señora Cruz Rodríguez solicitó la inhibición del juez Benero García y finalmente el caso fue referido a la atención de otro juez.

A raíz de las determinaciones del juez Benero García en las vistas celebradas el 27 de febrero y 12 de marzo de 2015, la representación legal de la señora Cruz Rodríguez presentó una petición de *certiorari* y *Moción en auxilio de jurisdicción* ante el Tribunal de Apelaciones. En estos solicitaron la revisión de la orden y resolución en la que dispuso que la niña viajaría a visitar al señor Ramos y en la que se ordenó que la señora Cruz Rodríguez no viajaría con ella, sino que tendría que enviar a una persona que la acompañara y sufragar dichos gastos. Este recurso fue presentado el mismo día en que la menor debía viajar para visitar a su padre, por lo que el Tribunal de Apelaciones paralizó los efectos de la determinación recurrida.

Finalmente, mediante sentencia de 27 de abril de 2015, el Tribunal de Apelaciones determinó revocar la orden emitida por el juez Benero García y devolver el caso para que se celebrara una vista en su fondo para asegurar que el

proceso que se llevara a cabo fuese justo y equitativo, toda vez que la señora Cruz Rodríguez no estuvo acompañada por su representación legal durante la vista. Aclaró, sin embargo, que lo resuelto no prejuzgaba los méritos del caso, ni debía interpretarse como un endoso a la conducta mostrada por la señora Cruz Rodríguez a través del proceso. Según el Tribunal de Apelaciones, la señora Cruz Rodríguez demostró obstinación y resistencia a reconocer que el señor Ramos tenía derechos como padre de la niña. El tribunal intermedio dispuso que en dicha vista debían evaluarse mecanismos para facilitar que se estableciera un plan de relaciones paterno filiales.

Durante su testimonio, la trabajadora social De Jesús expresó que en más de una ocasión dialogó con el juez Benero García fuera de sala sobre este caso y que durante tales conversaciones este se mostraba amigable y accesible. Además, señaló que este siempre mantiene la puerta abierta para los trabajadores sociales.

G.

Mientras estuvo asignado a la región judicial de Ponce, el juez Benero García presidió una sala de asuntos menos graves, tránsito y vistas preliminares en alzada, a la que a diario comparecían muchos testigos. Durante ese periodo, la Hon. Nereida Cortés González fue la juez administradora de la región judicial, y la Hon. Rosaline Santana Ríos era la juez coordinadora de las salas municipales y de violencia doméstica. Tanto la juez administradora Cortés González como

la juez Santana Ríos atendieron asuntos relacionados con la sala del juez Benero García. En particular, trataron el tema de la retención de abogados en sala y las órdenes de mostrar causa y de arresto emitidas por el juez Benero García.

A juicio de la juez administradora Cortés González, el juez Benero García tenía un estilo particular de atender su sala, en el que su interés era acelerar los procedimientos que se llevaban a cabo. Por ello acostumbraba retener a los abogados en su sala hasta que los casos fuesen atendidos. Ello requirió que la juez administradora Cortés González tuviese que atender situaciones en las que otros jueces de la región solicitaban su intervención para que el juez Benero García les permitiera a los abogados salir para presentarse a otras salas a atender asuntos pendientes. Esto se debía a que, para evitar recibir órdenes de mostrar causa o apercibimientos de desacato, los abogados acostumbraban comparecer primero a la sala del juez Benero García y permanecer allí hasta que el caso fuese atendido. Como juez administradora, la Hon. Cortés González trataba de que hubiese colaboración entre los compañeros jueces para que se permitiese flexibilidad en el movimiento de los abogados entre las salas, y estos pudiesen atender ciertos casos prioritarios. Señaló la juez administradora Cortés González que en la región existían acuerdos, no escritos, para que se les diera prioridad a los casos de confinados o aquellos cuyo término de derecho a juicio rápido estuviese próximo a vencer. En cuanto a ese aspecto, la juez administradora

Cortés González llamaba al juez Benero García a su sala y le pedía que permitiera a los abogados salir de su sala un momento para que a su vez las otras salas pudiesen atender sus calendarios.

A la juez Santana Ríos, como juez coordinadora, también llegaba a su atención cualquier incidente o preocupación que surgiera en las salas municipales por parte de ciudadanos, abogados o jueces. En ocasiones fue necesario que esta interviniera en asuntos relacionados con la sala del juez Benero García. La juez Santana Ríos manifestó no tener ninguna queja en términos de la laboriosidad del juez Benero García y añadió que era un juez muy trabajador y que realizaba sus funciones diarias. A su entender, la sala funcionaba ya que el trabajo se llevaba a cabo. No obstante, expresó que recibía llamadas de abogados por lo estricto que era el juez Benero García en sala. De igual forma, señaló que recibió llamadas de otros jueces porque el juez Benero García acostumbraba retener a los abogados en su sala. En específico, indicó que el juez Toledo Reyna se comunicaba con ella para informarle que su sala de vista preliminar se afectaba por la retención de abogados en la sala del juez Benero García. Sobre este asunto de la retención de abogados, la juez Santana Ríos solo recordó recibir comunicación del juez Jorge L. Toledo Reyna.

En una ocasión, el Lcdo. Carlos García Morales se comunicó con la juez Santana Ríos para solicitar su intervención porque tenía un conflicto con dos

señalamientos. Ese día, el licenciado García Morales tenía una vista en sus méritos en la sala del juez Benero García en el caso Pueblo v. Juan Retamar Hernández, J1CR201000103, sobre exposiciones deshonestas; en ese caso el acusado no se encontraba confinado. A su vez, el licenciado García Morales tenía señalada una vista preliminar en un caso, designado de oficio, en la sala del Hon. Toledo Reyna. Ese era un caso de agresión grave ocurrido dentro de una institución carcelaria en que estaban involucrados cinco imputados que se encontraban confinados. Declaró el juez Toledo Reyna que había sido difícil coordinar el señalamiento en este caso porque los acusados no tenían representación legal por lo que fue necesario designar abogados de oficio y otro a través de la Sociedad para la Asistencia Legal. Además, para celebrar la vista se realizaron arreglos para la seguridad en el tribunal, porque los confinados venían de distintas instituciones carcelarias.

Ante dicha situación, el licenciado García Morales solicitó ayuda a la juez Santana Ríos para que le informara la situación al juez Benero García. Esta comunicación por parte del licenciado García Morales se dio cerca de la 1:00 pm, antes de que fueran a dar inicio ambas vistas, las que estaban señaladas para las 2:00 pm. El licenciado García Morales nunca se comunicó con el Sr. Abimael Chamorro Chamorro, alguacil de sala del juez Benero García desde que este fue asignado al tribunal de Ponce, para notificar o

excusar su incomparecencia a la vista de esa tarde, como acostumbraban hacer todos los abogados.

Para atender esta situación, la juez Santana Ríos se comunicó con el juez Benero García para que permitiera que el licenciado García Morales atendiera primero la vista preliminar en la sala del juez Toledo Reyna y, luego, compareciera a la sala del juez Benero García. Expresó la juez Santana Ríos que tomó en consideración que se trataba de un caso que incluía cinco imputados que se encontraban confinados, que había unos términos con los que había que cumplir con más premura y, además, el asunto relacionado con las gestiones realizadas para coordinar la seguridad en el tribunal ante la comparecencia de dichos confinados. Por tales razones, la juez Santana Ríos solicitó la cooperación del juez Benero García, pero este se sostuvo en que atendería su caso porque ya había tenido señalamientos anteriores. Señaló la juez Santana Ríos que, a pesar de que le informó sobre el conflicto de los señalamientos del licenciado García Morales, era una cuestión discrecional del juez Benero García determinar si concedía turno posterior o recalendarizaba el caso y que en dicho aspecto ella no podía intervenir. Su interés fue ver de qué forma se podía trabajar la situación para que el licenciado García Morales pudiese atender ambos casos.

Antes de dar inicio a la vista, y estando ya los confinados y demás abogados en sala, el licenciado García Morales le informó al juez Toledo Reyna que tenía otro caso

señalado para esa misma tarde en la sala del juez Benero García. Inicialmente, el juez Toledo Reyna le solicitó a su secretaria que se comunicara con la oficina del juez Benero García, pero no se logró comunicación. Por tal razón, el juez Toledo Reyna se comunicó con la jueza Santana Ríos para que, como jueza coordinadora de asuntos de vista preliminar y subadministradora, se comunicara con el juez Benero García para determinar cómo se podía atender lo del señalamiento del licenciado García Morales en aquella sala. Declaró el juez Toledo Reyna que la juez Santana Ríos volvió a comunicarse para informarle que había dialogado con el juez Benero García y que podía continuar con la vista. Por entender que el asunto había sido resuelto, el juez Toledo Reyna regresó a sala y le informó al licenciado García Morales que no había problema y que podían celebrar la vista.

La vista señalada en el caso Pueblo v. Retamar Hernández era el único señalamiento que ocupaba el calendario de la sala del juez Benero García esa tarde y se encontraba presente la prueba de cargo, la perjudicada y el ministerio fiscal había anunciado que estaba preparado. Mientras tanto, el alguacil Chamorro Chamorro se comunicó con la sala del juez Toledo Reyna y el alguacil de dicha sala le confirmó que el licenciado García Morales se encontraba allí y que no podía salir de sala, lo que se informó al juez Benero García. Ante esta situación, este expidió una orden de mostrar causa contra el licenciado García Morales y dispuso que se diligenciara personalmente, encargando el diligenciamiento

al alguacil Chamorro Chamorro. Aunque en la orden de mostrar causa no se dispuso expresamente que se diligenciara en la sala del juez Toledo Reyna, el alguacil Chamorro Chamorro tomó la determinación de hacerlo mientras el licenciado García Morales se encontraba allí. Previo a diligenciar la orden, el alguacil Chamorro Chamorro solicitó autorización al alguacil de sala del juez Toledo Reyna, quien le solicitó que esperara a que terminara el interrogatorio que en ese momento se realizaba a un testigo.

Una vez finalizado el testimonio del testigo, el juez Toledo Reyna decretó un receso para darle oportunidad a los abogados de examinar una declaración jurada que había entregado el Ministerio Público, pero se mantuvo en sala por la presencia de los confinados. En ese momento, el alguacil Chamorro Chamorro entró por la puerta interna de la sala del juez Toledo Reyna, y se dirigió hacia el licenciado García Morales para diligenciar la orden de mostrar causa en su contra por no haber comparecido a la sala del juez Benero García. El alguacil Chamorro Chamorro indicó que el juez Benero García le había ordenado diligenciar esa orden de mostrar causa por la cual no debía ser hallado incurso en desacato por su incomparecencia a la vista, con una sanción de $5,000. En ese momento, el licenciado García Morales se puso nervioso ya que había solicitado que se le informara al juez Benero García que se encontraba atendiendo esa vista, lo que le provocó mucha tensión. Ante dicha situación, el licenciado García Morales informó al juez Toledo Reyna lo

que sucedió y este indicó que iba a verificar qué había ocurrido. El juez Toledo Reyna se comunicó con la juez Santana Ríos para informar el incidente en sala y tras dicha conversación, decidió continuar con la vista.

El licenciado García Morales expresó que, en ocasiones anteriores, cuando algún señalamiento coincidía con otro en la sala del juez Benero García, lo que hacía era reportarse inicialmente en su sala para entonces ir a la otra sala, donde le solicitaba al alguacil de dicha sala que se comunicara con el alguacil Chamorro Chamorro para indicarle que se encontraba allí. Esto lo hacía porque conocía que el juez Benero García requería que los abogados estuviesen en su sala. Luego, el licenciado García Morales se comunicó con la jueza Santana Ríos para informarle que el juez Benero García le impuso una orden de mostrar causa para no imponer una sanción de cinco mil dólares por su incomparecencia. Como parte de su testimonio, la jueza Santana Ríos reconoció que la orden de mostrar causa es el mecanismo utilizado por un juez para que un abogado explique las razones de su incomparecencia a los fines de no imponer sanciones.

Surge de la minuta de la vista que el juez Benero García dispuso que la orden de mostrar causa fuese notificada personalmente al licenciado García Morales. No obstante, el juez Benero García no ordenó específicamente que se diligenciara inmediatamente en la sala del juez Toledo Reyna, sino que fue el alguacil Chamorro Chamorro quien decidió hacerlo así. Finalmente, la vista en sus méritos

tuvo que ser reseñalada ante la incomparecencia del licenciado García Morales. Posteriormente se celebró la vista en la que se atendió la orden de mostrar causa contra el licenciado García Morales y allí este ofreció excusas al tribunal y expresó las gestiones que había realizado para que se le informara el conflicto por los señalamientos. Entonces, el juez Benero García no impuso la sanción. Según declaró el licenciado García Morales, el día de la vista observó que el trato que el juez Benero García dio a la perjudicada no fue distinto a como trató a otros testigos. Como parte de su testimonio, el licenciado García Morales indicó que litigó en varias ocasiones en la sala del juez Benero García mientras estuvo asignado a la región judicial de Ponce y describió cómo se atendían los asuntos en dicha sala.

En cuanto a la retención de abogados en sala, también declaró la Hon. Carmen Otero Ferreiras, juez coordinadora de asuntos de lo penal, durante el periodo en que el juez Benero García estuvo asignado a la región judicial de Ponce. Como parte de sus responsabilidades como juez coordinadora, tenía a su cargo supervisar el funcionamiento adecuado de los trabajos, calendarización de vacaciones de los jueces, aprobar asistencia y seminarios, entre otras cosas.

Durante ese periodo, el Hon. Mariano Daumont Crespo también estuvo asignado a una sala de tránsito y menos grave, y fue el juez pareja del juez Benero García. Los primeros miércoles de cada mes se señalaban los casos de embriaguez

en las salas que ambos atendían, razón por la cual surgían inconvenientes cuando los policías de la División de Tránsito tenían casos señalados en ambas salas. Expresó el juez Daumont Crespo que cuando esto ocurría, los policías, en la mayoría de las ocasiones, optaban por comparecer primero a la sala del juez Benero García. Por tal razón, cuando el juez Daumont Crespo llamaba los casos para ser atendidos, los agentes no estaban presentes y eso provocaba que tuviese que dar turnos posteriores y esperar que los casos de la sala del juez Benero García fuesen atendidos, para entonces poder ver los casos una vez los policías se presentaran en su sala.

A pesar de esta situación, el juez Daumont Crespo declaró que ello no afectaba su calendario ya que solo tenía que esperar a que el policía viniera a sala una vez se atendiera su caso en la sala del juez Benero García. Añadió que, en ocasiones, su alguacil se comunicaba con el alguacil del juez Benero García para solicitar que si el policía no estaba testificando viniera a su sala, y que estos llegaban regularmente. Expresó el juez Daumont Crespo que no tenía inconveniente en atender otros asuntos en sala en lo que los policías se desocupaban. La información que recibía de las secretarias y alguaciles era que el juez Benero García era más estricto en cuanto a la comparecencia de los policías a su sala.

Según la juez Otero Ferreiras, el juez Daumont Crespo le llegó a expresar su preocupación de que el juez Benero

García retenía en su sala a los abogados o ciudadanos, lo que provocaba que se retrasara el manejo de los asuntos de su sala. No obstante, el juez Daumont Crespo le manifestaba no tener problema alguno en esperar a que los abogados y ciudadanos terminaran de atender sus asuntos en la sala del juez Benero García, para que después pasaran a la suya. Según la juez Otero Ferreiras, el juez Daumont Crespo era más pasivo en la forma de atender los asuntos de su sala y, por el contrario, el juez Benero García era más activo en la forma de manejar su sala.

El Lcdo. Luis Muñiz Echevarría, abogado de la Sociedad para la Asistencia Legal, postuló en numerosas ocasiones ante el juez Benero García cuando estuvo asignado a la región judicial de Ponce. Allí atendía generalmente casos de vista preliminar en alzada. El licenciado Muñiz Echevarría describió la forma en la que el juez Benero García atendía los asuntos en sala, tales como la imposición de desacato por incomparecencia de testigos o agentes del orden público, o cuando ordenaba el arresto de víctimas de delito por no comparecer a las vistas. El licenciado Muñiz Echevarría indicó que el trato que brindaba el juez Benero García a los agentes de la Policía era normal y cordial, pero en aquellas ocasiones en que no comparecían a sala, su trato era severo y no se tomaba en consideración las razones para la incomparecencia. El licenciado Muñiz Echevarría declaró que no se sentía cómodo cuando presenciaba estos incidentes. Sin embargo, el testimonio estipulado del sargento Louis

Maurosa, agente de la Policía de Puerto Rico, fue que él compareció ante el juez Benero García y este nunca lo maltrató o abusó de su poder, que siempre fue muy respetuoso en todas las ocasiones en que compareció a su sala y que no recuerda haber recibido alguna queja por parte de agentes en relación con el trato del juez Benero García.

Con posterioridad se llevó a cabo una reunión en la que estuvieron presentes la juez administradora Cortés González, la juez Santana Ríos y el juez Benero García, con el propósito de dialogar sobre el tema de las órdenes de mostrar causa, órdenes de arresto, así como el manejo de los asuntos en sala para mejorar el movimiento de los casos. También se habló sobre lo ocurrido con el licenciado García Morales. Durante su testimonio, la juez administradora Cortés González señaló que los incidentes relacionados con el juez Benero García, en cuanto a las órdenes de mostrar causa, órdenes de arresto y las fianzas que imponía, fueron traídos a su atención también en reuniones interagenciales en las que participaban la Policía y la Sociedad para la Asistencia Legal.

Según la juez administradora Cortés González, tras la reunión no hubo cambio en el juez Benero García ya que ese era su estilo de manejar la sala. Expresó que, en ese aspecto, ella no podía intervenir porque cada juez maneja los asuntos en su sala de la forma en que entienda. En aquello en que ella podía intervenir administrativamente hacía el acercamiento directo con el juez Benero García.

Reconoció que los abogados se mantuvieron compareciendo primero a la sala del juez Benero García, para así evitar que se expidieran en su contra órdenes de mostrar causa u órdenes de arresto, para entonces presentarse en las demás salas. Por tal razón, cada vez que los otros jueces requerían su intervención, la juez administradora Cortés González llamaba al juez Benero García para pedirle que permitiera a los abogados comparecer a las demás salas.

Por otra parte, el Lcdo. Ricardo Negrón Rodríguez fungió como procurador asignado al tribunal de Ponce mientras el juez Benero García estuvo allí. El testimonio estipulado del procurador Negrón Rodríguez fue a los efectos de que compareció con frecuencia a la sala del juez Benero García y que este nunca lo maltrató o abusó de su poder. Además, dijo que le consta la competencia profesional del juez Benero García, así como su puntualidad. Añadió que tampoco fue objeto de conducta alguna por parte del juez Benero García que pudiera tener alguna trascendencia antiética y que es su opinión que el juez trataba a todos los abogados por igual.

El Lcdo. Rafael Sánchez Valentín, Director de Servicios Legales de Ponce, compareció frecuentemente ante el juez Benero García para atender asuntos de lo criminal de menores y de relaciones de familia mientras estuvo asignado al tribunal de Ponce. El testimonio estipulado del licenciado Sánchez Valentín fue a los efectos de que como director de la Oficina de Servicios Legales no recuerda haber recibido

queja alguna por parte de los abogados del programa en cuanto al trato o competencia del juez Benero García. De igual forma le consta la competencia profesional y puntualidad del juez Benero García, que nunca fue objeto de conducta alguna de su parte que pudiera tener alguna trascendencia antiética y que, en su opinión, el juez trataba a todos los abogados por igual.

Mientras el juez Benero García estuvo asignado a la región judicial de Ponce, también ocurrió un incidente con el Hon. José M. Ramírez Legrand. Un día, mientras este se encontraba en sesión atendiendo su sala de vista preliminar, observó al juez Benero García asomarse por la puerta de la sala que daba al pasillo interior, lo que lo sorprendió ya que desconocía las razones para ello. La actuación del juez Benero García no fue del agrado del juez Ramírez Legrand quien lo consideró como una intromisión indebida en los procedimientos de su sala. Al concluir los procesos en sala, el Juez Ramírez Legrand se comunicó por teléfono con el juez Benero García para reclamarle por haber interrumpido los procedimientos en su sala, por considerarlo una falta de deferencia y respeto a un compañero juez. El juez Ramírez Legrand le expresó que lo ideal en esas situaciones era que se comunicara con el juez que tuviera al abogado en su sala y no entrar de esa forma en la sala de otro juez. En ese momento el juez Benero García no le dijo nada al juez Ramírez Legrand. Posteriormente el juez Benero García fue donde la juez administradora Cortés González para hablarle sobre

dicho incidente. A partir de ese día, el juez Ramírez Legrand no volvió a tener más incidentes con el juez Benero García.

De otra parte, la Lcda. Magaly Galarza Cruz, quien se desempeñó como juez superior en el tribunal de Ponce, fue compañera de trabajo del juez Benero García mientras estuvo asignado allí. El testimonio estipulado de la licenciada Galarza Cruz fue a los efectos de que sus relaciones profesionales con el juez Benero García fueron excelentes y que nunca tuvo constancia de que el funcionamiento de la sala de este afectara el funcionamiento del tribunal. De igual forma, manifestó que el juez Benero García era cooperador y muy profesional en el trato que le brindaba a ella.

Como parte de sus funciones como secretaria de servicios a sala en la región judicial de Ponce, la Sra. Susana Rivera León asistía a la sala del juez Benero García entre dos y tres veces en semana. Aquellos días en que había muchos casos señalados, los horarios de sesión en la sala del juez Benero García podían extenderse un poco más allá de las 12:00 pm, pero ello sucedía de forma infrecuente. En ocasiones, cuando llegaba la hora de recesar del medio día, la señora Rivera León le pasaba un papel al juez para avisarle y este recesaba.

Durante el periodo en que el juez Benero García permaneció en Ponce, la Comisión de Evaluación Judicial llevó a cabo una evaluación de este como consecuencia de una solicitud de ascenso presentada. Por tal razón, el Sr. Freddy

Santiago Puig, quien se desempeña como investigador de la Comisión de Evaluación Judicial, tuvo la encomienda de realizar dicha investigación. Entre las funciones del señor Santiago Puig se encuentran la de realizar entrevistas e investigaciones sobre las ejecutorias del juez a ser evaluado, mediante visitas al tribunal donde se encuentre asignado. Antes de iniciar el proceso investigativo, el señor Santiago Puig acostumbra visitar al juez a ser evaluado para notificarle que se comenzará con la etapa de investigación y ofrecerle información sobre cómo ello se llevaría a cabo.

Como parte de su primera visita al juez Benero García en Ponce, el señor Santiago Puig se presentó en su sala. Declaró que, al entrar por la puerta de la sala del juez Benero García, este con un tono de voz alto y fuerte, le cuestionó quién era él. En ese momento el investigador procedió a sentarse. Más adelante, el juez Benero García explicó que estaban esperando a un policía que sería testigo de un caso. Luego, durante un receso, el alguacil de sala le dijo al investigador Santiago Puig que pasara a la oficina del juez Benero García porque este lo iba a atender. El investigador Santiago Puig le explicó que el motivo de su visita era notificarle sobre el inicio de la investigación como parte de su solicitud de ascenso.

Testificó el investigador Santiago Puig que se sintió intimidado y le impresionó fuertemente el comportamiento del juez Benero García hacia él en el momento en que entró a

sala, la que estaba llena al momento en que ocurrió el incidente. Añadió que nunca había tenido una experiencia similar en la que delante de otras personas se le tratara de esa forma. Posteriormente, el señor Santiago Puig también tuvo a su cargo otra investigación que fue parte de una evaluación periódica del juez Benero García cuando este ya se encontraba asignado a la región judicial de Carolina.

H.

Una vez trasladado a la región judicial de Carolina, el juez Benero García fue asignado para presidir una sala de relaciones de familia y menores que tenía bastante volumen de casos señalados a diario. Durante gran parte del tiempo que el juez Benero García estuvo allí asignado, el juez administrador regional era el Hon. Alberto Pérez Ocasio y la Hon. Delmarie Vega Lugo era la jueza coordinadora de relaciones de familia. El alguacil asignado a su sala era el Sr. Jaime Rosario Gutiérrez y las Sras. Jessmarie Santiago Ortiz y Sara M. Figueroa Díaz se desempeñaron como secretarias de servicios a sala.

La Lcda. Mayte Flores Morales ocupa el cargo de Procuradora de Asuntos de Menores en la región judicial de Carolina. Esta conoció al juez Benero García para el periodo en que él se desempeñaba como Procurador de Asuntos de Menores. Luego, ella tuvo la oportunidad de litigar en su sala casos de menores, aunque no fue con frecuencia. La Procuradora Flores Morales postulaba con más frecuencia en la sala de la juez Delmarie Vega Lugo, quien presidía el

Tribunal de Menores en Carolina. Solo en aquellas ocasiones en las que la juez Vega Lugo no estaba disponible por encontrarse de vacaciones o cuando no podía atender su sala, el juez Benero García la sustituía.

A la procuradora Flores Morales le llamaba la atención que el juez Benero García, en ocasiones, utilizaba términos propios de una sala de lo criminal de adultos, a pesar de que lo que se atendían allí eran asuntos de menores, y él se había desempeñado anteriormente como Procurador de Menores. Por ejemplo, utilizaba la palabra "culpable" en lugar de "incurso" o "sentencia" en vez de "medida dispositiva". La procuradora Flores Morales relató un incidente en que se encontraba atendiendo una vista de causa en un caso de Ley de Armas ante la Hon. Dinorah Suárez, quien atendía dicha sala diariamente. El caso se transfirió para la tarde. La procuradora Flores Morales, anticipando que podría llegar tarde a la vista, se comunicó con la alguacil de sala para solicitar que se le concediera turno posterior, el cual fue concedido por la juez Suárez. La procuradora Flores Morales llegó a la sala poco tiempo después de la hora señalada y se encontró con que el juez Benero García estaba atendiendo la sala de la juez Suárez. Al llegar, el juez Benero García le cuestionó fuera de récord por haber llegado tarde y le informó que se había comunicado con su supervisor para preguntar por qué no había comparecido a la hora pautada. La procuradora Flores Morales le explicó las razones por las que había llegado tarde a la sala, ya que se encontraba

atendiendo otra vista, y así lo había informado a la alguacil de sala y se le había concedido un turno posterior. El abogado de defensa y los agentes de la Policía llegaron a la sala después que la procuradora Flores Morales.

Iniciada la vista, el juez Benero García hizo constar que la procuradora Flores Morales había llegado tarde a sala y esta expresó para el registro las razones por las cuales eso ocurrió. El abogado de defensa solicitó la suspensión de la vista a lo que la procuradora Flores Morales se allanó porque las partes estaban conversando para llegar a un preacuerdo. No obstante, el juez Benero García no quería suspender la vista e insistía que el caso se viese en sus méritos. La procuradora Flores Morales intervino para que el juez Benero García autorizara la suspensión de la vista. En ese momento el juez Benero García cuestionó a la procuradora Flores Morales si tenía autorización del Departamento de Justicia para llegar a un preacuerdo en esa etapa de los procedimientos, lo que a su entender era en contravención a las órdenes administrativas. Luego de eso se decretó un receso hasta que el juez Benero García regresó a sala y finalmente se decretó la suspensión del caso. En cuanto a este incidente, no se presentó prueba que justificara la suspensión solicitada ya que expresar que existía la posibilidad de un preacuerdo no es un fundamento que necesariamente acarree una suspensión. La procuradora Flores Morales se sintió incómoda cuando el juez Benero García le cuestionó si su proceder era cónsono con las órdenes

administrativas del Departamento de Justicia, porque ella las conocía y las cumplía. Por otra parte, indicó que ha recibido un trato cordial y de respeto por parte del juez Benero García.

Por su parte, el Lcdo. Carlos Alonso Sánchez, quien también se desempeña como Procurador de Menores, postuló en la sala del juez Benero García, aunque en pocas ocasiones. Su experiencia en dicha sala, en general, fue descrita como normal. Mencionó que en dos o tres ocasiones se sintió incómodo en sala por situaciones que no fueron de su agrado. Narró una ocasión en que mientras sustituía en sala a una procuradora, el juez Benero García, desde el estrado, le dijo que una moción de renuncia de jurisdicción no era de su agrado, y le recomendó que se comunicara con la oficina de San Juan para que solicitara las mociones que el juez Benero García había presentado cuando ocupaba el cargo de Procurador de Menores. Además, en otra ocasión, el juez Benero García desde el estrado le cuestionó si el Lcdo. Marcos Algarín, supervisor de los procuradores, tenía conocimiento de los términos del preacuerdo al que se había llegado. El procurador Alonso Sánchez aclaró al juez Benero García que ese preacuerdo se encontraba entre los asuntos que ellos podían atender.

El otro incidente narrado por el procurador Alonso Sánchez se trataba de un caso en alzada asignado a la procuradora Flores Morales, el cual fue señalado mientras ella se encontraba de vacaciones. El procurador Alonso

Sánchez compareció a la sala del juez Benero García para informarle al alguacil de sala que la procuradora Flores se encontraba de vacaciones, pero que cualquiera de los otros dos procuradores disponibles atendería el caso. El alguacil le dijo que esperara, pero en el ínterin el procurador Alonso Sánchez tuvo que irse porque fue mandado a buscar por otra juez que se disponía a abrir sala. Mientras el procurador Alonso Sánchez se encontraba litigando en esa sala, se asomó por la puerta la procuradora Calero Font para informarle que lo estaban llamando en la sala del juez Benero García. La juez que atendía el caso no le permitió salir de sala ya que había iniciado la vista, por lo que no saldría hasta que culminara. Cuando salió de sala, la procuradora Calero Font le informó que el juez Benero García expidió una orden de mostrar causa y una orden de arresto si no comparecía. Después de terminar el caso, el procurador Alonso Sánchez fue a la sala del juez Benero García a explicar lo ocurrido, pero ya este había recesado y el alguacil le indicó que regresara en la tarde para que le informara al juez. En la tarde, el procurador Alonso Sánchez compareció a la sala del juez Benero García a ofrecerle explicaciones sobre lo ocurrido. No obstante, el juez Benero García le dijo desde el estrado que, si un procurador no comparecía a sus vistas lo iba a mandar a buscar arrestado. A pesar de las explicaciones ofrecidas, el juez Benero García no dejó sin efecto la orden de mostrar causa esa tarde. En la próxima vista en ese caso, por estar vigente todavía la orden de

mostrar causa, compareció a sala el procurador Alonso Sánchez a ofrecer las mismas explicaciones y el juez Benero García volvió a mencionarle que él era el director de la oficina y que si no venía un procurador lo iba a mandar a buscar arrestado. El procurador Alonso Sánchez nunca recibió una notificación de que se haya dejado sin efecto la orden de mostrar causa.

En cuanto a la pregunta sobre si su supervisor tenía conocimiento del preacuerdo, el procurador Alonso Sánchez expresó que no lo interpretó como una falta de respeto porque conocía al juez Benero García desde hace varios años cuando ambos fueron procuradores y consideró que eso era parte de su personalidad. También manifestó que mientras se desempeñó como procurador, el juez Benero García era estudioso del derecho y defendía muy bien sus casos.

La Lcda. Maricarmen Calero Font, quien se desempeña como Procuradora de Asuntos de Familia, estuvo asignada por varios años a la región judicial de Carolina y comparecía semanalmente a la sala del juez Benero García. Según las directrices administrativas existentes en la región de Carolina, a cada procurador se le asignaban unas salas fijas dependiendo del día de la semana. Esta asignación de procuradores se le notificaba a los jueces administradores y demás jueces. En el caso de la procuradora Calero Font, le correspondía asistir todos los martes a la sala del juez Benero García para atender los casos de relaciones de familia y menores.

La procuradora Calero Font testificó que a menudo el juez Benero García la citaba para comparecer a su sala fuera de los días que habían sido asignados, lo que ocasionaba inconvenientes en la oficina de los procuradores. La directriz existente en su oficina era que, si algún caso era citado para un día que no era el asignado a dicha sala, tenían que solicitar transferencia de vista por escrito. Según explicó la procuradora Calero Font, los procuradores no tenían discreción para decidir si comparecían o no a la vista, sino que tenían que solicitar por escrito la transferencia de vista una vez se recibía la notificación del señalamiento. En algunas ocasiones, la procuradora Calero Font informó a la Supervisora de los procuradores de Carolina, Lcda. Ivette Nieves Cordero, que había recibido citaciones del juez Benero García para comparecer a su sala en días que no correspondían al asignado a dicha sala. La supervisora de los procuradores le instruía entonces a presentar la correspondiente moción sobre reseñalamiento, pues ese era el trámite que resultaba procedente ya que esta no interesaba hacer gestión alguna ante la juez coordinadora. En relación con este incidente, no se presentó prueba que permitiera establecer que fue el juez Benero García quien señaló directamente el caso para el día en que no estaría la procuradora o si fue un señalamiento proveniente de la Secretaría.

En una ocasión hubo un caso de alimentos que fue señalado para un miércoles, día en que la procuradora Calero

Font asistía a la sala de maltrato. Ese día, la procuradora Calero Font estaba atendiendo los casos en la sala de maltrato, los que usualmente eran alrededor de diecisiete. Por esa razón, le resultaba difícil salir de dicha sala si la mandaban a buscar para presentarse en otra. La Procuradora Calero Font declaró que su clienta en el caso de alimentos se comunicó con ella para informarle que su caso se había atendido sin que la procuradora estuviera presente, a pesar de que solicitó al tribunal que no se celebrara la vista sin su presencia. Por esa razón, una vez la Procuradora Calero Font culminó de atender los asuntos en la sala de maltrato, preparó y presentó una moción para hacer constar que la vista de alimentos se llevó a cabo sin su presencia, a pesar de que su representada había solicitado estar acompañada por la procuradora y que la cifra que se utilizó para determinar la deuda estaba errónea.

La supervisora de los procuradores no recuerda haber recibido notificación por parte de la procuradora Calero Font de que el juez Benero García hubiera atendido alguna vista sin la comparecencia de ella. Tampoco recuerda haber recibido notificación por parte de procurador alguno, ni tampoco de la juez coordinadora, con relación a que el funcionamiento de la sala del juez Benero García afectara el funcionamiento de otras salas. La Hon. Delmarie Vega Lugo, juez coordinadora de Asuntos de Familia, no recuerda haber recibido queja alguna por parte de la procuradora Calero Font en torno a que recibiera señalamientos fuera del día

asignado o que el juez Benero García celebrara vistas en su ausencia.

La Unidad de Trabajo Social de la región judicial de Carolina es dirigida por la Sra. Norma Pérez Albandoz y allí se atienden los casos referidos por los jueces de relaciones de familia y menores, para la preparación de informes sociales sobre custodia, patria potestad y relaciones filiales, entre otros. Como parte de sus funciones como supervisora, la señora Pérez Albandoz estableció procesos internos para atender los referidos de los jueces. Explicó que cuando recibía la orden de un juez en la Unidad de Trabajo Social, se abría un expediente y se le asignaba número y una trabajadora social. Luego de este trámite es que se citaban las partes. El término para preparar y presentar los informes es de sesenta días en casos de custodia y de cuarenta y cinco días en los casos de patria potestad y relaciones filiales. Según declaró la señora Pérez Albandoz, esta entendía que para poder cumplir con dichos términos era necesario, para agilizar el proceso, asignar a la trabajadora social que lo tendría a su cargo. Si la orden de un juez se atrasaba en llegar a la unidad, se afectaba el proceso para la preparación del informe social.

A los fines de acelerar este proceso, la señora Pérez Albandoz solicitaba a las oficinas de los jueces que la orden fuese escrita el mismo día y se enviara con prontitud a su oficina, y que se le prestara el expediente del caso para sacarle copia y así poder asignarlo. De ese modo, el informe

podría presentarse dentro del término requerido. De lo contrario, el expediente bajaba para la preparación de las minutas por la secretaria de servicios a sala, lo que retrasaba el recibo de la orden en la Unidad de Trabajo Social. En aquellas ocasiones en las que el informe social no podía presentarse a tiempo, la señora Pérez Albandoz tenía que presentar una moción informando las razones por las cuales este no se completó.

La señora Pérez Albandoz expresó que el juez Benero García comenzó a establecer como práctica decirle a los ciudadanos que debían comunicarse con la Unidad de Trabajo Social para solicitar cita. Sin embargo, según declaró la señora Pérez Albandoz, hasta que la orden del juez se recibiera en la Unidad de Trabajo Social no se podía iniciar el proceso y coordinar una cita. Esta situación comenzó a presentarle inconvenientes en su oficina ya que comenzaron a recibirse llamadas de ciudadanos, a los que era necesario explicarles que aún no se les podía dar cita porque para ello era necesario recibir la orden del juez y asignar una trabajadora social.

También indicó la señora Pérez Albandoz que un día se encontró con el juez Benero García en el ascensor del tribunal de Carolina. Allí este le expresó que un abogado le informó en sala que una secretaria de la unidad le indicó a su cliente que no se le citaría de inmediato según ordenado. En ese momento la señora Pérez Albandoz le expresó que esa no era la instrucción que ella había impartido en la oficina

y, mientras caminaban por el pasillo, ella intentó explicarle cuál era el proceso que se llevaba a cabo en su oficina para cumplir con los términos para preparar los informes sociales. Además, le expresó que prefería que una vez se emitiera la orden se les notificara automáticamente y se les prestara el expediente para sacarle copia y así comenzar a preparar el informe social. La preocupación de la señora Pérez Albandoz era que, de no realizarse todo de esa forma, atrasaría el recibo de la orden y tendría que esperar por el curso normal, el cual incluía que la orden pasara por la Secretaría y se notificara. El juez Benero García le dijo que no le interesaba conocer cómo se realizaba el trabajo de su oficina, que eso lo trabajara ella. Ante tal reacción, la señora Pérez Albandoz le manifestó que no se estaban entendiendo y que se comunicaría con la juez coordinadora para dialogar el asunto entre ellos para ver si se podía llegar a un acuerdo para agilizar los procesos.

Aunque la señora Pérez Albandoz testificó ante la Comisión de Disciplina Judicial sobre una alegada reacción y expresiones del juez Benero García ocurridas en ese momento, las partes estipularon el testimonio del alguacil Rosario Gutiérrez que presenció este incidente y que es su recuerdo que el juez Benero García no realizó expresiones relacionadas a que en su sala judicial solamente mandaba él y no la jueza coordinadora, el juez administrador ni la Jueza Presidenta, así como que el juez Benero García no le levantó la voz a la señora Pérez Albandoz. De igual forma, la Sra.

María Jiménez Seda, quien también presenció el incidente por este haber culminado en la puerta de su oficina y cuyo testimonio fue estipulado por las partes, declararía que es su recuerdo que el juez no realizó las expresiones antes mencionadas, así como que el juez Benero García no le levantó la voz a la señora Pérez Albandoz. A pesar de que la señora Pérez Albandoz testificó que en ese momento le expresó al juez Benero García que dialogaría el asunto con la juez coordinadora, las partes estipularon que el testimonio de la juez Vega Lugo sería que no recuerda haber recibido queja de parte de la señora Pérez Albandoz en cuanto a algún incidente que hubiese tenido con este o en cuanto a que el funcionamiento de su sala afectara los procesos internos de la Unidad de Trabajo Social. Como parte de su testimonio, la señora Pérez Albandoz reconoció que no existía memorando alguno que instruyera a los jueces de Relaciones de Familia y Menores a enviar las órdenes para la preparación de los informes sociales a la Unidad de Trabajo Social antes que a la Secretaría.

I.

Por otra parte, la Lcda. María de L. Guzmán es abogada de la práctica privada y, para el año 2013, compareció en dos ocasiones ante el juez Benero García. Ella representaba al Sr. Elvis Crespo Díaz, quien solicitaba se le relevara del pago de pensión alimentaria porque su hijo había alcanzado la mayoría de edad. La licenciada Guzmán describió su experiencia en la sala del juez Benero García como la más

amarga que ha tenido como abogada, porque recibió de su parte, y sin explicación alguna, un trato que ella consideró atropellador. Era la primera vez que comparecía a dicha sala.

La primera vista ante el juez Benero García se celebró en julio de 2013. Cuando la vista inició, el juez Benero García le cuestionó dónde se encontraba su cliente. La abogada explicó que su cliente se encontraba en la sala de emergencias del hospital. Entonces, el juez Benero García le indicó que iba a convertir la vista en una de orden de mostrar causa por la que no debía encontrar a su cliente incurso en desacato por su incomparecencia. La licenciada Guzmán le expresó que el caso era de naturaleza civil y que se encontraba lista para atender los asuntos preliminares de la controversia. Dijo, además, que le solicitaría al tribunal que el joven entregara documentos que acreditaran la necesidad de continuar recibiendo pensión alimentaria. Declaró la licenciada Guzmán que, ante su solicitud, el juez Benero García indicó que no iba a hacer nada ese día si su cliente no estaba presente. La licenciada Guzmán insistió que podían adelantar los trámites si el joven entregaba la información requerida para examinarla, pero el juez Benero García, en lo que ella describió como un tono altanero, expresó que era su cliente quien tenía que pedir el relevo de pensión alimentaria y quien tenía el peso de la prueba. Añadió el juez Benero García que su cliente tenía que presentar evidencia de que se encontraba enfermo y que, si

tenía que citar al médico, así lo haría y que si no entregaba esa información desestimaría la solicitud de relevo.

Tras este incidente, la licenciada Guzmán le dijo a su cliente que solicitaría la inhibición del juez Benero García si en la próxima vista volvía a tratarla de igual forma. Cuando se celebró la próxima vista en agosto, el joven aún no había entregado documento alguno que acreditara que debía continuar recibiendo pensión alimentaria, a pesar de habérselo requerido su abogada. En esa vista, la licenciada Guzmán entregó copia del récord médico que evidenciaba que su cliente había sido atendido en el hospital para la fecha de la vista anterior. Después de examinarlo con detenimiento, el juez Benero García se lo devolvió.

Como las partes no pudieron llegar a acuerdos, el juez Benero García les informó que los referiría a mediación de conflictos y la licenciada Guzmán le contestó que eso no procedía. A renglón seguido, el juez Benero García le dijo que no lo interrumpiera y que se anotara en el récord la hora. La licenciada Guzmán le indicó que ella tenía que expresarse porque tenía que defender a su cliente. El juez Benero García solicitó que se anotara que era la segunda vez que la licenciada Guzmán lo interrumpía. Añadió que mandaría a las partes a llenar la Planilla de Información Personal y Económica (PIPE), a lo que la licenciada Guzmán le expresó que tampoco procedía. El juez Benero García manifestó que se anotara que era la tercera vez que lo interrumpía. En esa ocasión, la licenciada Guzmán le expresó al juez Benero

García que solicitaría su inhibición porque tenía prejuicio en contra suya o de su cliente, que su trato era inusual y no le permitía hacer su trabajo. Para el alguacil Rosario Gutiérrez, quien presenció el incidente entre el juez Benero García y la licenciada Guzmán, ella lo interrumpió en varias ocasiones levantando su voz y el juez fue muy paciente y respetuoso con ella.

Como consecuencia de esta situación, su cliente se puso nervioso y le solicitó al juez Benero García que le permitiera hablar con su hijo. A partir de ese momento, la actitud del juez Benero García cambió y le permitió hablar con su hijo. No obstante, le aclaró al señor Crespo que cualquier acuerdo al que llegaran no lo podría aceptar porque se había solicitado su inhibición, pero su cliente insistió en que le permitieran dialogar con él y se les buscó un lugar para hacerlo. Regresaron a sala y su cliente le informó que habían llegado a un acuerdo. La licenciada Guzmán le dijo a su cliente que, en atención a que habían llegado a un acuerdo que permitiría dar finalidad a la controversia, ella retiraría su solicitud de inhibición. Finalmente, el juez Benero García aceptó el acuerdo y concluyó la vista. Al final de la vista, padre e hijo terminaron unidos en un abrazo y lágrimas. Para el alguacil Rosario Gutiérrez esta unión fue promovida por el juez Benero García y no por la licenciada Guzmán, quien insistía en sus planteamientos, por lo que el propio cliente tuvo que pedir permiso al juez para dirigirse

al Tribunal y solicitar que se le permitiera reunirse con su hijo.

J.

Por otra parte, en cuanto a la prueba testifical a ser presentada por la representación legal del juez Benero García, se estipularon los testimonios de la Lcda. Sylvia Juarbe Berríos, la Lcda. Maribel Rivera Monzón y el Lcdo. Rubén Falú Allende. Cada uno de estos testigos ejerce la práctica privada de la abogacía y comparecieron con frecuencia ante el juez Benero García para atender asuntos de lo criminal de menores y de relaciones de familia mientras el juez Benero García estuvo en el tribunal de Carolina. Los testimonios estipulados de cada uno de ellos fueron a los efectos de que les consta la competencia profesional y puntualidad del juez Benero García y que nunca los maltrató o abusó de su poder en perjuicio de estos. Además, en ocasión de los casos atendidos por el juez Benero García, le consta a cada uno de los testigos el compromiso del magistrado hacia las partes desventajadas y, en particular, su esfuerzo para lograr el cumplimiento del pago de pensión alimentaria por parte de alimentantes morosos. A su vez añadieron que nunca observaron conducta alguna del juez Benero García que pudiera tener alguna trascendencia antiética y era la opinión de los testigos que el juez trataba a todos los abogados por igual.

K.

También la Lcda. Grace Casanova Castro, abogada de la práctica privada quien llegó a ocupar el cargo de Procuradora de Asuntos de Familia, declaró sobre los incidentes relacionados con un caso que tuvo asignado a la sala del juez Benero García. Para octubre de 2012, la licenciada Casanova Castro asumió la representación legal de la Sra. Yolanda Rivera en un caso sobre privación de patria potestad en que se solicitaba la privación de patria potestad del padre de la menor por existir alegaciones de abuso sexual. Al momento en que la licenciada Casanova Castro asumió la representación de la señora Rivera, ya se habían realizado evaluaciones por parte de peritos que habían validado las alegaciones de abuso sexual por parte de la menor, por lo que se comenzaron las gestiones para solicitar la privación de patria potestad del padre.

La licenciada Casanova Castro indicó que como parte de este caso se llegaron a celebrar múltiples vistas. En particular, la licenciada Casanova Castro relató sobre su experiencia en una vista en su fondo celebrada el 9 de enero de 2014. Originalmente la vista fue señalada para las 9:00 am, sin embargo, cuando ya todos estaban en sala, se les informó que el caso se atendería en la tarde. Para esa vista se encontraban en sala ambas partes junto a sus representantes legales, así como los peritos de cada parte. Señaló la licenciada Casanova Castro que permanecieron en sala esperando hasta que el caso fuese llamado para la

celebración de la vista en su fondo ya que había muchos casos en calendario ese día. El juez Benero García pretendía terminar de atender los asuntos de rápida disposición y dejar la vista en su fondo para horas de la tarde.

El desfile de prueba en el caso dio inicio a la 1:30 pm. Iniciados los procedimientos, el juez Benero García advirtió a las partes que el caso comenzaría y se terminaría ese mismo día, por lo que continuarían hasta finalizar. Como la vista se extendería hasta más de las 5:00 pm, el juez Benero García impartió instrucciones a la Sra. María Jiménez Seda para que informara al juez administrador Pérez Ocasio que permanecerían en sala un poco después de las 5:00 pm, para que le fuese notificado al supervisor de alguaciles. La señora Jiménez Seda informó la situación al juez administrador Pérez Ocasio mediante correo electrónico.

El primer receso se decretó entre las 6:00 a 8:00 pm, a solicitud de las abogadas de ambas partes, para salir a tomar alimentos. El receso concedido por el juez Benero García fue de treinta (30) minutos. Alrededor de las 11:00 pm, el juez Benero García le preguntó a la licenciada Casanova Castro si quería recesar, porque era la segunda vez que ella salía de sala por razones de salud. En ese momento, la licenciada Casanova Castro respondió en la negativa, toda vez que de recesar en ese momento debían regresar en la mañana para culminar con la presentación de la prueba y, habiendo dos peritos en sala, consideraba irrazonable recesar a esa hora para que tuviesen que regresar temprano

al día siguiente para finalizar. Por tal razón, la licenciada Casanova Castro prefirió que se continuara con la vista porque ya estaban bastante adelantados en el proceso y no faltaba mucho más en el desfile de prueba.

Tras concluir el desfile de prueba, el juez Benero García expresó, en corte abierta, que el abuso sexual del padre contra su hija había ocurrido. Sin embargo, como el juez Benero García no realizaba determinación alguna en cuanto a la privación de patria potestad y el abuso sexual, la licenciada Casanova Castro le preguntó específicamente cuál era su determinación en cuanto a ello, y el juez Benero García le expresó que no tenía duda de que el abuso sexual había ocurrido pero que no privaría de patria potestad. Manifestó el juez Benero García que la niña era muy pequeña y se le hacía más daño privándola de la patria potestad que buscando la reunificación con su padre. A su vez, el juez Benero García ordenó a la parte contraria que presentara un borrador de proyecto de sentencia con relación a la privación de patria potestad. Finalmente, la vista concluyó a las 12:38 am del 10 de enero de 2014. La extensión de la vista, más allá del horario regular de sesión, contó con la aprobación del juez administrador Pérez Ocasio, conforme se desprende de un correo electrónico de 9 de enero de 2014, y con la anuencia de los funcionarios de sala.

Días después de celebrarse la vista, el juez Benero García emitió una minuta-resolución, en la que validó el abuso sexual del padre contra su hija. De ella surge que el

juez Benero García refirió el caso a la Unidad de Trabajo Social para la preparación de un plan de servicio en el que se le realizaran evaluaciones psiquiátricas y psicológicas al padre, y se le notificara al tribunal si este se encontraba apto para relacionarse con la menor. Además, ordenó que la menor recibiera ayuda psicológica hasta que se encontrara preparada para comenzar las relaciones paterno-filiales, supervisadas por un profesional de la salud, siempre y cuando fuesen para su beneficio. Añadió que, de así recomendarlo el profesional de la salud, se ampliarían, limitarían o eliminarían las relaciones paterno-filiales.

Posteriormente se celebraron alrededor de tres o cuatro vistas adicionales. La licenciada Casanova Castro declaró que la parte demandada no había cumplido con presentar las mociones que el tribunal requirió, por lo que presentó varias mociones para indicarle al tribunal que no tenía jurisdicción para continuar prorrogando los términos a la parte demandada, porque estos ya habían vencido. Sin embargo, el juez Benero García continuó extendiéndolos sin que la parte lo solicitara. Después de transcurridos ocho meses y concederse varias prórrogas, la parte demandada presentó el borrador de proyecto de sentencia.

Para septiembre de 2014, el juez Benero García emitió una resolución en la que declaró no ha lugar la solicitud de privación de patria potestad. Determinó que no hubo abuso sexual, pero sí conducta inadecuada, por lo que no iba a privar de patria potestad porque ello pudiese ocasionar más

daño a la niña que una integración familiar. El juez Benero García entendió que la conducta exhibida no fue suficiente como para privar al padre de la patria potestad en ese momento. El juez Benero García refirió el caso a la Unidad de Trabajo Social para que se coordinara un plan de servicios y se le informara si el padre se encontraba apto para relacionarse con la menor. Dispuso, además, que la menor debía recibir ayuda hasta que estuviera preparada para relacionarse con su papá, de forma supervisada, una vez el psicólogo y el psiquiatra de la Unidad de Trabajo Social lo recomendaran. El juez Benero García prohibió las relaciones paterno-filiales hasta que los peritos del tribunal recomendaran lo contrario y así el tribunal lo dispusiera.

La licenciada Casanova Castro recurrió ante el Tribunal de Apelaciones para que se revisara la determinación del juez Benero García y, además, por este haber concluido que una de las razones por las que no privaría de la patria potestad era que existían distintos grados de abuso, por lo que era necesario evaluar el grado de abuso y examinar las terapias que el padre pudiese recibir, para entonces decidir si debía relacionarse o no con su hija.

El Tribunal de Apelaciones, en la sentencia emitida en el caso, determinó revocar el dictamen del juez Benero García. Resolvió que el juez se equivocó al disponer de la controversia, al retractarse de su previa determinación sobre validación de abuso sexual del padre en contra de su hija. Para efectos del Tribunal de Apelaciones, resultaba

contradictorio encontrar al padre incurso en conducta impropia mas no en abuso sexual. El Tribunal de Apelaciones decretó la privación de patria potestad por haberse validado el abuso sexual. Concluyó que al resolverse que el padre incurrió en dicho patrón de conducta, solo procedía la privación solicitada. Añadió que el estatuto esbozado no concedía al tribunal discreción alguna al respecto, ni tampoco condicionaba el pronunciamiento correspondiente a la visión de "distintos grados en el abuso". El Tribunal de Apelaciones consideró errónea esa expresión porque carece de fundamento legal y es incompatible con el interés de protección de los menores, que permea en nuestro estado de derecho.

                            II.

Al juez Benero García se le imputó violar los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial, 4 L.P.R.A. Ap. IV-B. Estos preceptos, a grandes rasgos, pautan las obligaciones generales con las que deben cumplir los jueces y establecen guías en cuanto al desempeño de la función judicial y adjudicativa.

Como se sabe, nuestro ordenamiento jurídico requiere la existencia de prueba clara, robusta y convincente de que hubo violaciones éticas para imponer sanciones disciplinarias. In re Candelaria Rosa, 197 DPR 445, 459 (2017); In re Quiñones Artau, 193 DPR 356, 386 (2015); In re Muñoz, Morell, 182 DPR 738, 750 (2011). Ese estándar probatorio "es más alto y sólido que el de preponderancia de

la prueba, pero menos exigente y riguroso que el de prueba más allá de duda razonable". In re Salas Arana, 188 DPR 339, 347 (2013). Hemos definido la prueba clara, robusta y convincente como "aquella evidencia que produce en el juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables". In re Martínez Almodóvar, 180 DPR 805, 820 (2011). Véase, además, In re Candelaria Rosa, supra, pág. 459.

De igual forma, en múltiples ocasiones hemos manifestado que es improcedente alterar las determinaciones de hecho de la Comisión de Disciplina Judicial, excepto que se demuestre parcialidad, prejuicio o error manifiesto. In re Candelaria Rosa, supra, pág. 459; In re Hon. Maldonado Torres, supra, pág. 869. Ello se debe a que la Comisión de Disciplina Judicial ocupa el papel de juzgador de hecho y, por lo tanto, está en mejor posición para aquilatar la prueba testifical. In re Ortiz Brunet, 152 DPR 542, 548 (2000).

El comportamiento de los miembros de la judicatura es uno de los pilares de nuestro sistema judicial. In re Cancio González, 190 DPR 290 (2014). Esto se debe a que la confianza que tiene la ciudadanía en la Judicatura se cimienta, en gran medida, en el comportamiento que observan quienes la componen. Los jueces son el reflejo de nuestro sistema judicial y su conducta, al igual que sus expresiones, inciden en la percepción que tiene la ciudadanía sobre los tribunales en general. In re Acevedo Hernández, 194 DPR 344 (2015); In re Santiago Concepción, 189 DPR 378 (2013).

Como parte de los deberes generales aplicables a los miembros de la judicatura, el Canon 1 de Ética Judicial, supra, dispone que estos respetarán y cumplirán la ley y serán fieles al juramento de su cargo. Este precepto responde

> al interés en reconocer que el deber judicial trasciende la función de administrar o interpretar la ley y se establece con el objetivo de transmitir claramente la idea de que los jueces no están por encima de la ley y son los primeros obligados a respetarla y cumplirla. Ín re Candelaria Rosa, supra, pág. 465.

Por su parte, el Canon 3 de Ética Judicial, supra, expresa que los deberes judiciales tienen prioridad sobre cualquier otra actividad, razón por la cual los jueces no abandonarán ni descuidarán las obligaciones de su cargo. Por otro lado, conforme establece el Canon 4 de Ética Judicial, supra, corresponde a los jueces cumplir diligentemente con las obligaciones administrativas impuestas por las leyes o reglamentos aplicables a la Rama Judicial, así como las normas y órdenes administrativas aplicables que emita la Oficina de Administración de los Tribunales. In re Mercado Santaella, 197 DPR 1032, 1066 (2017); In re Pagani Padró, 181 DPR 517 (2011).

De igual forma, el Canon 5 de Ética Judicial, supra, prohíbe que los jueces discriminen por motivo de raza, color, nacimiento, origen, condición socioeconómica, ideas políticas o religiosas, condición física o mental, edad, género u orientación sexual. Los jueces tampoco pueden permitir que las demás personas que comparezcan ante el tribunal o el personal bajo su dirección incurran en esa

conducta discriminatoria. In re Robles Sanabria, 151 DPR 483 (2000).

Con el propósito de lograr una administración eficiente de la función judicial, el Canon 6 de Ética Judicial, supra, requiere que exista cooperación entre los compañeros jueces. Por eso, dispone que la conducta entre magistrados debe caracterizarse por el respeto mutuo, cordialidad y la colaboración profesional, sin que importen las diferencias en sus posiciones dentro del sistema judicial. In re Vicenty Nazario II, 169 DPR 228 (2006). Este mismo precepto jurídico indica que no harán críticas infundadas que tiendan a menospreciar el prestigio de sus compañeros jueces.

Por otra parte, el Canon 8 de Ética Judicial, supra, dispone que los jueces deben ser laboriosos, prudentes, serenos e imparciales al llevar a cabo sus labores, y que deben enmarcar sus funciones adjudicativas en el estudio del Derecho y en la diligencia orientada a descubrir los hechos esenciales de cada controversia. In re Pagani Padró, supra, pág. 526. Este canon pretende evitar que los integrantes de la Judicatura resuelvan controversias cegados por la autoridad que les confiere la toga. In re Colón Colón, supra, pág. 739. Véanse, además, In re Sierra Enríquez, supra, pág. 851; In re Cruz Aponte, 159 DPR 170, 180 (2003). Ello obedece a que la imparcialidad en el desempeño de la función judicial es inherente a la misión de impartir justicia. In re Grau Acosta, 172 DPR 159, 171 (2007).

Ante la necesidad de que los jueces observen una conducta imparcial, precisamos en Lind v. Cruz, 160 DPR 485, 491 (2003), citando a Pueblo v Maldonado Dipiní, 96 DPR 897, 910 (1969), que el prejuicio o parcialidad personal se refiere a una actitud que tiene su origen fuera del plano judicial, o sea, en el plano extrajudicial. Por tal razón, para determinar si existe o no prejuicio personal por parte del juez, es indispensable realizar un análisis de la totalidad de las circunstancias a la luz de la prueba presentada. Ruiz v Pepsico P.R., Inc., 148 DPR 586, 589 (1999).

Por otra parte, el Canon 9 regula la evaluación de la prueba presentada como parte del proceso judicial, además de los asuntos sometidos ante la consideración de un magistrado. Este Canon resalta la obligación básica de conceder el derecho a ser oído, conforme dispone la ley, a toda persona que sea parte en un procedimiento. El Canon 9 de Ética Judicial, supra, establece, en parte, que:

> Las juezas y los jueces concederán a toda persona que tenga interés en un procedimiento o la abogada o al abogado de dicha persona el derecho a ser oída conforme lo dispone la ley. En el cumplimiento de este deber, resolverán cada controversia fundamentándose en su propia evaluación de la prueba presentada.

Surge del Comentario al Canon 9, que el deber de garantizar al ciudadano el derecho a ser oído se incluyó con el fin de resaltar su importancia como parte del debido proceso en el ámbito de la función adjudicativa. En cuanto a este aspecto, hemos indicado que "la negativa del debido

proceso de ley es la falta de observar aquella imparcialidad fundamental que es la esencia de todo concepto de justicia". In re Díaz García, 158 DPR 549, 559 (2003), citando a Valentín v. Torres, 80 DPR 463, 482 (1958). Para concluir si un error de hecho o de derecho constituyó una violación del Canon 9, debe demostrarse que hubo un abuso intencional de la discreción judicial o que su magnitud figuró conducta impropia o favoritismo hacia alguna parte. In re Quiñones Artau, supra, pág. 379; In re Díaz García, supra, págs. 558-559.

Conforme establece el Canon 13 de Ética Judicial, supra, toda persona que comparezca ante el tribunal debe recibir un trato de respeto y consideración. Esta obligación no se circunscribe únicamente a la figura del juez, sino que también es su responsabilidad requerir igual trato por parte de las demás personas presentes. Íd. Véanse, además, In re Quiñones Artau, supra, pág. 381; In re Claverol Siaca, 175 DPR 177, 189 (2009).

Por su parte, el Canon 14 de Ética Judicial, supra, establece cuál es la conducta que se espera de los jueces durante el transcurso del proceso judicial. A esos fines, dispone:

> **Canon 14. Conducta en los procedimientos judiciales**
>
> En el curso de los procedimientos judiciales, las juezas y los jueces mantendrán su conducta dentro de la debida propiedad y circunspección sin mostrar impaciencia o severidad excesivas. Tampoco harán comentarios ni gestos ajenos al proceso judicial, entendiéndose comprendidos dentro de esta prohibición, aquellos comentarios,

expresiones o gestos que envuelvan burla o mofa. No ridiculizarán de modo alguno a abogadas, abogados, partes, testigos, funcionarias o funcionarios del tribunal ni a otras personas que acudan ante el tribunal.

Las juezas y los jueces dirigirán los trabajos del tribunal con orden y decoro, y evitarán todo proceder que pueda afectar la dignidad y el respeto debido al tribunal. Intervendrán para impedir cualquier conducta impropia de las partes, las abogadas y los abogados o cualquier otra persona, y tomarán las acciones que procedan de acuerdo con la ley, los Cánones del Código de Ética Profesional y las mejores tradiciones del sistema judicial.

De acuerdo con el canon antes citado, los jueces tienen el deber de conservar la dignidad de todo trámite judicial y fomentar el respeto mutuo entre las partes. In re Quiñones Artau, supra, pág. 381; In re Maldonado Torres, supra, pág. 865. Dicho de otra forma, todas las personas que forman parte del proceso judicial tienen un deber de cortesía con los demás participantes, ya sean jueces, testigos, abogados o funcionarios del tribunal. In re Saavedra Serrano, 165 DPR 817 (2005). Sin embargo, hemos dejado claro que "respeto no es adular ni rendir pleitesía sino reconocer la calidad humana de las personas que componen nuestro sistema de justicia para que impere entre ellos un trato digno, cordial y a la altura de la función que realizan los tribunales". In re Candelaria Rosa, supra, pág. 462.

Hemos mencionado antes que "aunque la figura del juez está revestida de autoridad, ésta no debe utilizarse indebidamente dentro o fuera del tribunal. La referida disposición va dirigida a evitar que un juez tome decisiones ensoberbecido por el poder". (Escolio omitido.) In re Cruz

Aponte, 159 DPR 170, 180 (2003). En los comentarios que acompañan al Canon 14, supra, se indica que "[e]l juez o la jueza deberá evitar, además, toda expresión suya que pueda reflejar prejuicio de la naturaleza que sea o que pueda arrojar dudas sobre su capacidad para actuar imparcialmente". Véase, además, R.J. Torres Torres, Cánones de Ética Judicial de Puerto Rico, 9 Forum 7, 8 y 22 (1993).

Ahora bien, lo anteriormente dicho no implica que el juez esté desprovisto de un remedio para vindicar la dignidad del tribunal, ya que cuenta con el mecanismo del desacato civil y criminal, además de otras medidas que establezca la ley o sea avalada por el sistema judicial. In re Quiñones Artau, supra, pág. 381. Como este caso se origina, en parte, por la imposición de sanciones por desacato a varios ciudadanos como consecuencia de incidentes surgidos durante procesos judiciales que presidía el juez Benero García, procederemos a examinar esa figura.

El desacato es un procedimiento sui generis que exige la inmediata intervención del tribunal y cuyo objetivo es vindicar su autoridad y dignidad. In re Velázquez Hernández, 162 DPR 316, 326 (2004); Pueblo v. Torres, 56 DPR 605, 623 (1939). Para la doctrina, cualquier acto o conducta que tienda a impedir u obstruir la administración de la justicia por un tribunal o que menoscabe su autoridad o dignidad constituye desacato. Santos P. Amadeo, El poder de los tribunales en Puerto Rico para castigar por desacato, Madrid, Ed. Revista de Derecho Privado, 1961, pág. 5.

Por una parte, en el desacato civil se impone una penalidad por un término indefinido, sujeta a que la persona cumpla con una orden u obligación. In re Velázquez Hernández, supra, pág. 327. La penalidad que se impone tiene el fin de obligar a cumplir con una orden del tribunal. Íd. Por su parte, el desacato es criminal si lo que el juez busca es castigar a la persona o vindicar la autoridad del tribunal. Srio. D.A.C.O. v. Comunidad San José, Inc., 130 DPR 782, 804 (1992). El desacato criminal puede castigarse de forma sumaria cuando la conducta constitutiva de delito ocurre en presencia de un juez, ya que el tribunal está constituido. Regla 242 de las de Procedimiento Criminal. 34 LPRA Ap. II.

El desacato puede incurrirse de forma directa o indirecta. Se comete directamente cuando la acción u omisión ocurre en presencia del tribunal. Íd. Es indirecto cuando la conducta que obstruye la debida administración de la justicia se comete a distancia del tribunal y fuera de su presencia inmediata. In re Cruz Aponte, 159 DPR 170, 182 (2003).

Consecuentemente hemos expresado que "los jueces deben utilizar el desacato como última alternativa para vindicar la autoridad del tribunal, debido a que el uso indiscriminado de este instrumento equivaldría a una falta de temperamento judicial". Íd., pág. 181. El desacato no puede convertirse en una herramienta de opresión que destruya el propio orden e integridad del proceso que la ley quiso mantener. Pueblo v. Susoni, 81 DPR 124 (1959).

Es preciso puntualizar que en In re Quiñones Artau, supra, pág. 384, citando a In re Sierra Enríquez, 185 DPR 830, 849 (2012), indicamos que no se puede invocar la jurisdicción disciplinaria para pasar juicio sobre un dictamen judicial, en sustitución de los mecanismos de revisión que el ordenamiento jurídico provee. Ello es contrario a la Regla 3 de Disciplina Judicial, 4 LPRA Ap. XV-B, que establece que no será investigada, como parte del proceso disciplinario contra jueces, aquella queja que pretenda intervenir impropiamente con determinaciones judiciales, excepto en aquellos casos en los que la conducta denote un posible factor exógeno indebido en la determinación judicial. De ordinario, un error de hecho o de derecho cometido por un juez en el desempeño de sus funciones no es causa para disciplinarlo. In re Díaz García, *supra*, pág. 557. Cuando se cometen esos errores, la parte adversamente afectada tiene a su disposición el procedimiento de revisión judicial que consagra nuestro ordenamiento jurídico.

III.

A.

Para adjudicar en este proceso disciplinario si las actuaciones antes descritas del juez Benero García constituyeron violaciones de los Cánones de Ética Judicial, no podemos limitarnos a evaluar en el vacío la conducta imputada por la OAT. Por el contrario, es necesario tomar en consideración el historial procesal de cada uno de esos

casos, tal como lo hizo la Comisión de Disciplina Judicial. Ese examen riguroso de los eventos ocurridos en esos casos, unido a una revisión de sus expedientes correspondientes, demuestran que procede acoger la recomendación de la Comisión de Disciplina Judicial y desestimar la querella de epígrafe, ya que no se demostró que el juez Benero García abusara intencionalmente de su discreción judicial al utilizar el mecanismo de desacato o que haya actuado con la intención de favorecer impropiamente a una parte.

En cuanto al caso de la señora Rodríguez Santiago, el juez Benero García impuso el desacato ante la incomparecencia de ella a la vista, a pesar de que fue citada en corte abierta en una vista anterior. También surge del expediente que la señora Rodríguez Santiago no se comunicó para notificar su retraso en llegar a la corte. Asimismo, del historial del caso surgió que en ocasiones anteriores la parte demandante había solicitado al tribunal que se encontrara incursa en desacato a la señora Rodríguez Santiago por obstruir las relaciones paterno filiales. Ella se oponía a las relaciones, aunque los informes sociales las recomendaban. Por último, es necesario mencionar que no se puede imputar al juez Benero García el arresto de la señora Rodríguez Santiago sin que se hubiese expedido por escrito la orden de arresto. El alguacil Rosario Gutiérrez reveló en su testimonio estipulado que fue decisión suya, y no del juez Benero García, diligenciar la orden de arresto, aunque no la tenía disponible en ese momento.

Por otra parte, en cuanto al desacato impuesto a la señora Muriel Rodríguez, se desprende de la regrabación de la vista celebrada ante el juez Benero García que su arresto se debió a la deuda por pensión alimentaria que tenía al momento. Desde la vista anterior se había ordenado a la señora Muriel Rodríguez pagar el total adeudado por concepto de pensión. Al no cumplir con la deuda, el juez Benero García determinó declarar la deuda líquida, vencida y exigible, y ordenó la ejecución de la orden de arresto. Adviértase que el juez Benero García había encontrado incursa en desacato a la señora Rodríguez en ocasiones previas por incumplir con los pagos de pensión de alimentos. El reiterado incumplimiento con las órdenes del tribunal fue la razón por la que se ordenó el arresto de la señora Muriel Rodríguez y se impuso una fianza de quinientos dólares. A pesar de lo anterior, el juez Benero García mostró preocupación por el estado de embarazo de la señora Muriel Rodríguez e impartió instrucciones dirigidas al Departamento de Corrección para que se le ofreciera toda la ayuda médica necesaria.

De igual manera, en el caso del señor Figueroa Serrano, el arresto por desacato ordenado por el juez Benero García se basó en que todavía existía un balance pendiente de pago por concepto de pensión alimentaria, luego de tomar en consideración unos pagos presuntamente realizados. Nótese que con anterioridad, el juez Benero García había encontrado incurso en desacato al señor Figueroa Serrano por no pagar una pensión alimentaria.

Al estudiar el historial del caso del señor Figueroa Serrano notamos que la reclamación de alimentos se presentó en el 2010 pero no fue hasta una vista sobre desacato en marzo de 2014, que este reclamó por vez primera tener un crédito por un periodo en el que tuvo la custodia de sus hijos. Como esa información no surgía del expediente del caso, el juez Benero García le advirtió que mientras no acreditara ese hecho no se consideraría crédito alguno. A pesar de que se le requirió evidenciar que tuvo la custodia de sus hijos, el señor Figueroa Serrano no cumplió. Entonces, en la vista celebrada en junio de 2014, el señor Figueroa Serrano volvió a esgrimir que tenía derecho a un crédito. Al cuestionársele por la documentación que lo sustentaba, este expresó que ello formaba parte del expediente de otro caso. Ante ese escenario, el juez Benero García solicitó el expediente a la Secretaría y le concedió la oportunidad al señor Figueroa Serrano para que buscara los documentos; después de todo, era él quien debía probar que era merecedor del crédito. Al no encontrarse en el expediente la evidencia requerida y existir una deuda pendiente a pesar de que se acreditaron ciertos pagos realizados, el juez Benero García encontró incurso en desacato al señor Figueroa Serrano por el balance pendiente. En conclusión, el desacato impuesto se fundamentó en el incumplimiento por parte del señor Figueroa Serrano con su obligación de proveer alimentos a sus hijos.

Asimismo, debemos indicar que, según surge de los testimonios estipulados del alguacil Rosario Gutiérrez y la

señora Santiago Ortiz, en ocasiones múltiples el señor Figueroa Serrano intentó interrumpir al juez Benero García mientras se dirigía a los presentes. Como parte de su testimonio ante la Comisión de Disciplina Judicial, el señor Figueroa Serrano reconoció que los documentos que justificaban su alegado crédito no obraban en el expediente del caso de alimentos porque nunca los presentó y que el periodo en el que tuvo la custodia de sus hijos fue en 2009, antes de que se presentara la demanda de alimentos en su contra.

Al igual que la Comisión de Disciplina Judicial, concluimos que no existe prueba clara, robusta y convincente de que el juez Benero García abusó intencionalmente del recurso de desacato en estos casos o que actuó para favorecer impropiamente a una parte, en contravención de los Cánones 1, 3, 5, 8, 9, 13 y 14 de Ética Judicial, supra. In re Candelaria Rosa, supra, pág. 462; In re Quiñones Artau, supra, pág. 381; In re Santiago Concepción, supra, pág. 403. Al contrario, surge del expediente que el juez Benero García se encontraba ante personas que incumplieron órdenes judiciales e hicieron caso omiso a su autoridad, quebrantaron la obligación de pagar pensiones de alimentos o dejaron de comparecer a las vistas señaladas. Ante ese escenario, los jueces tienen discreción para la imposición de un desacato, como ocurrió aquí. In re Velázquez Hernández, supra, pág. 326; Pueblo v. Torres, supra, pág. 623. Fue improcedente utilizar la vía disciplinaria en sustitución de

los mecanismos que nuestro ordenamiento jurídico provee para revisar esas determinaciones judiciales. In re Quiñones Artau, supra, pág. 384; In re Sierra Enríquez, supra, pág. 849.

B.

Por su parte, en lo que respecta al caso de relaciones paterno-filiales en que la señora Cruz Rodríguez era demandada, surge del expediente que las determinaciones del juez Benero García fueron revisadas por el Tribunal de Apelaciones en dos ocasiones. En la primera, se confirmó la resolución que ordenaba que la niña viajara al continente a relacionarse con su padre biológico. En ese entonces, el Tribunal de Apelaciones expresó que la señora Cruz Rodríguez obstaculizó el establecimiento de las relaciones y detalló varios incidentes en lo que se demostraba indiferencia ante las órdenes del foro primario. Incluso, el Tribunal de Apelaciones concluyó que el juez Benero García actuó con sabiduría. Miguel Ramos v. Leishla Cruz Rodríguez, KLCE-2014-00935, Sentencia de 26 de agosto de 2014, págs. 9-10.

Por el contrario, en la segunda revisión, el Tribunal de Apelaciones revocó una orden dictada por el juez Benero García en que se había autorizado el viaje de la menor a visitar a su papá. En ese momento, el foro apelativo intermedio devolvió el caso para que se celebrara una vista en su fondo, ya que la señora Cruz Rodríguez no estuvo acompañada de representación legal durante la primera vista. Asimismo, el Tribunal de Apelaciones expresó que lo resuelto

no prejuzgaba los méritos del caso ni se interpretaba como un endoso a la conducta de la señora Cruz Rodríguez, la que caracterizó como obstinada y resistente a reconocer los derechos del señor Ramos como padre de la menor. Miguel Ramos v. Leishla Cruz Rodríguez, KLCE-2015-00409, Sentencia de 27 de abril de 2015, pág. 19.

Del trámite procesal del caso se desprende que la señora Cruz Rodríguez exhibió un patrón de incumplimiento de las órdenes judiciales, con la intención de imposibilitar que el padre se relacionara con su hija. Incluso, no se lograron establecer las relaciones paterno filiales por vía telefónica, a pesar de lo que el juez Benero García ordenó. Luego de dos años de esfuerzo por parte del tribunal, la niña continuaba sin entablar una relación con su padre biológico ante la resistencia contumaz que demostró la señora Cruz Rodríguez.

Por otra parte, la decisión del juez Benero García de no privar de la patria potestad en el caso en que participaba la licenciada Casanova Castro, fue revisada por el Tribunal de Apelaciones. Tras examinar el asunto, el foro apelativo intermedio revocó la decisión. Concluyó que se cometió un error al disponer de la controversia, ya que el juez Benero García se retractó de su determinación previa durante la vista en la que validó el abuso sexual. Asimismo, el Tribunal de Apelaciones consideró que las expresiones relacionadas con los distintos grados del abuso sufrido fueron erróneas. Por esa razón, y después de validar que hubo un patrón de

abuso sexual, el foro apelativo decretó la privación de la patria potestad porque el estatuto no concedía al tribunal discreción para hacer otra cosa.

Como hemos expresado, un error de hecho o de derecho en el desempeño de sus funciones no es fundamento adecuado para iniciar una acción disciplinaria. In re Quiñones Artau, supra, pág. 384; In re Sierra Enríquez, supra, pág. 849. Ante estos errores de derecho la parte afectada tenía a su disposición el mecanismo de revisión judicial, que utilizó en este caso. El Tribunal de Apelaciones revocó la decisión emitida por el juez Benero García por considerarla errónea. Por tanto, aquí no existen circunstancias extremas que nos lleven a concluir que el error del juez Benero García constituyera una violación de los Cánones de Ética Judicial. In re Candelaria Rosa, supra, pág. 462; In re Quiñones Artau, supra, pág. 381; In re Santiago Concepción, supra, pág. 403.

C.

Atendemos ahora el incumplimiento alegado del juez Benero García con las normas administrativas sobre los horarios de sesión del tribunal. La Regla 12(b) de Administración del Tribunal de Primera Instancia, 4 LPRA Ap. II-B, establece que las horas regulares de sesión serán de 9:00 am a 12:00 pm y de 2:00 pm a 5:00 pm, a menos que el juez considere necesario extenderlas por necesidades del servicio. Para ello se coordina con anticipación con el juez administrador. Íd. Los testimonios de las secretarias de servicios a sala, Sra. Rivera León y Sra. Figueroa Díaz,

establecieron que, en ocasiones, el juez Benero García podía extenderse hasta después de la 12:00 pm. No obstante, la señora Rivera León, quien laboró junto al juez Benero García en la región judicial de Ponce, declaró que eso ocurría muy poco. Asimismo, expresó que cuando llegaba la hora de recesar ella le avisaba pasándole una nota y el juez recesaba. De igual forma, la señora Figuera Díaz testificó que, en ocasiones, el horario de la mañana podía extenderse debido a la cantidad de casos en calendario. Por último, la extensión en el horario de la vista en la que participó la licenciada Casanova Castro fue notificada al juez administrador Pérez Ocasio y contó con su anuencia.

De lo anterior se desprende que no se demostró que el juez Benero García incurriera en un patrón de extender el horario de sesión de su sala, sino que según surgió de los testimonios de las secretarias de servicios a sala, ello solo ocurrió en pocas ocasiones. Además, la propia Regla 12(b) permite que el horario de sesión sea extendido por necesidades del servicio, y en el caso específico de la sala del juez Benero García, cuando esto llegó a ocurrir, se debió a la cantidad de casos en calendario. En su consecuencia, no se probó el quinto cargo de la querella de autos que imputó una transgresión del Canon 4 de Ética Judicial, _supra_, por infringir las normas administrativas ni la violación del Canon 13, _supra_, que obliga a tener un trato considerado para con los participantes del procedimiento judicial. _In re Mercado Santaella_, _supra_, pág. 1066; _In re Pagani Padró_,

supra; In re Quiñones Artau, supra, pág. 381; In re Claverol
Siaca, supra, pág. 189.

D.

Otra conducta que se imputó al juez Benero García fue
el efecto que tenía en otras salas la forma en que este
manejaba los asuntos de su sala. En particular, se señaló la
forma en que requería la presencia de los abogados y testigos
en su sala hasta que los casos fuesen llamados. En
específico, la OAT imputó al juez Benero García no colaborar
con sus compañeros jueces al retener abogados y testigos en
su sala y retrasar de esa forma los procedimientos en otras,
sin tomar en consideración el impacto que ocasionaba para la
sana administración de la justicia. Como parte de su rol al
presidir sala, cada juez tiene discreción para establecer
ciertas medidas internas para el manejo de los asuntos en su
sala. No obstante, estas no deben afectar adversamente el
funcionamiento, en general, de otras salas del tribunal. Si
se afectan de forma significativa las labores de otras salas,
corresponde entonces a los jueces administradores, en
función del cargo que ejercen, tomar medidas administrativas
para coordinar en forma eficiente y efectiva los trabajos de
todas las salas sin que se causen mayores contratiempos en
el trámite de los casos. La Regla 7(c) de Administración del
Tribunal de Primera Instancia, 4 LPRA Ap. II-B, establece
que el juez administrador de la región judicial será
responsable de la supervisión y buen funcionamiento de dicha
región. A su vez, en el inciso 7(C)(1)(q) de esa regla se

dispone que entre las funciones delegadas al juez administrador se encuentran asignar, distribuir y supervisar la administración de los asuntos judiciales entre los jueces de la región judicial y el calendario de trabajo diario, así como adoptar las medidas administrativas internas que sean necesarias para asegurar la eficiencia de los procesos judiciales y agilizar el trámite de los casos. Íd. Estas funciones exigen del juez administrador desplegar un liderato que permita conciliar los intereses de los jueces en atender sus calendarios de la manera más ágil posible. Por ello, si la práctica del juez Benero García en alguna forma afectaba el funcionamiento de otras salas del tribunal de Ponce, recaía en la dirección administrativa de la región judicial tomar medidas para lograr un balance entre los requerimientos del juez Benero García y los de los demás jueces. Sin embargo, en este caso fue escasa la intervención de la juez administradora Cortés González y la juez subadministradora Santana Ríos para intentar resolver la situación, ya que asumieron la postura de que los asuntos relacionados con el manejo de sala recaían dentro del ámbito de la discreción judicial del juez Benero García y que en ese aspecto no podían intervenir. Incluso, la juez administradora Cortés González expresó que se trataba de un estilo particular del juez Benero García de manejar su sala. No surge de los autos que se hubiese emitido alguna medida administrativa concreta para trabajar la situación, más allá de las reuniones antes relatadas.

Cuando ocurren situaciones que afectan el funcionamiento del tribunal, los jueces administradores deben identificarlas y actuar con premura estableciendo directrices claras dirigidas a resolverlas efectivamente. En este caso tanto, la juez administradora Cortés González, la jueza subadministradora Santana Ríos como la juez coordinadora Otero Ferreiras debieron asumir una posición más proactiva al momento de buscar posibles soluciones, si los requerimientos dificultaban realmente el movimiento de los casos en las demás salas del tribunal de Ponce. Las medidas administrativas tomadas fueron escasas. En la medida en que el trámite de los casos se viera afectado, debieron auscultar otros mecanismos internos que se pudieran implantar para asegurar que la atención del calendario de las demás salas no se retrasara de forma significativa.

Dicho de otro modo, este asunto debió atenderse de forma oportuna en el ámbito administrativo por los funcionarios que tenían a su cargo la administración de la región judicial, en particular, la juez administradora y la juez subadministradora, de conformidad con las funciones que le fueron delegadas. No tomar medidas adicionales amparándose en que se trataba de un asunto de discreción judicial, sin más, resultó insuficiente. Había que buscar los mecanismos para armonizar la comparecencia de abogados y testigos a las distintas salas del Tribunal de Ponce, sin causar más dilaciones en la atención de los casos.

Se alegó el impacto negativo que tenía en la sala del juez Daumont Crespo el que los abogados y testigos comparecieran primero a la sala del juez Benero García. Sin embargo, el juez Daumont Crespo testificó que su sala no se afectaba. Expresó, además, que no tenía problema en conceder un turno posterior y esperar que el abogado o testigo acudiera a su sala cuando se terminara de atender su caso en la sala del juez Benero García. El juez Daumont Crespo señaló que, en esas ocasiones, el alguacil se comunicaba con la sala del juez Benero García y solicitaba que, de ser posible, se le permitiera al abogado o testigo comparecer a su sala y con regularidad estos se presentaban. El otro incidente al que se hizo referencia entre el juez Benero García y el juez Ramírez Legrand, por el primero asomarse por la puerta de la sala del segundo en búsqueda de un abogado, fue un incidente desafortunado que no volvió a suceder.

Con relación al incidente narrado por la señora Pérez Albandoz, es necesario contrastar sus declaraciones con los testimonios estipulados de la juez Vega Lugo, el alguacil Rosario Gutiérrez y la señora Jiménez Seda. La juez Vega Lugo, juez coordinadora de las Salas de Relaciones de Familia y Menores, no recuerda haber recibido queja de la señora Pérez Albandoz sobre incidentes con el juez Benero García. Además, los testimonios estipulados del alguacil Rosario Gutiérrez y la señora Jiménez Seda, quienes presenciaron el incidente en parte, fue que no recordaban que el juez Benero García hubiese realizado las expresiones que indica la

señora Pérez Albandoz en cuanto a que en su sala solo mandaba él y no la juez coordinadora, el juez administrador ni la Jueza Presidenta; ni que el juez le haya levantado la voz a la señora Pérez Albandoz. Nótese que la señora Pérez Albandoz solicitaba la expedición de una orden del juez refiriendo el expediente del caso a la Unidad de Trabajo Social, a pesar de que el juez Benero García acostumbraba referir los expedientes directamente a la Secretaría para el encausamiento del caso.

Todas estas diferencias de manejo de sala o de los expedientes judiciales debieron atenderse por la vía administrativa, sin tener que llegar al ámbito disciplinario. Recalcamos que no se presentó evidencia de medidas concretas tomadas por parte de la administración para atender por la vía administrativa estas diferencias. En fin, no se probó el cuarto cargo de la querella que imputó una transgresión de los Cánones 6 y 13 de Ética Judicial en lo referente al trato cordial y respeto que debe permear entre magistrados. In re Vicenty Nazario II, supra; In re Quiñones Artau, supra, pág. 381; In re Claverol Siaca, supra, pág. 189.

E.

En cuanto al sexto cargo relacionado con los resultados de las evaluaciones realizadas por la Comisión de Evaluación Judicial, la OAT sometió el caso ante la consideración de la Comisión de Disciplina Judicial **sin presentar evidencia documental alguna** que lo sostuviera. Ante ello, la Comisión

expresó en su informe que "nada habremos de considerar en cuanto a este asunto dado que la OAT no presentó evidencia que sustentara dicho cargo". Informe de la Comisión de Disciplina Judicial, pág. 73. En un escrito presentado luego de que el asunto estuviera sometido ante nuestra consideración, la OAT expresó que no tenía que presentar prueba durante las vistas ante la Comisión ya que el Juez Benero García admitió la existencia, pero no el contenido, de las evaluaciones de "no calificado" emitidas por la Comisión de Evaluación Judicial bajo el esquema regulatorio previo. Véase, Reglamento para la Evaluación de Jueces y Juezas del Tribunal de Primera Instancia de 18 de marzo de 2015. Por su parte, la representación legal del juez Benero García sostuvo que no podía encontrarse probado el sexto cargo pues la OAT decidió no presentar en evidencia el documento de la evaluación de la Comisión de Evaluación Judicial. Coincidimos con esta aseveración. La postura de la OAT equivale a conferir naturaleza de cosa juzgada a los resultados de las evaluaciones judiciales, lo que supone permitir la aplicación automática de sanciones éticas por lo que determine la Comisión de Evaluación Judicial. Eso no es posible. Sería una usurpación de la jurisdicción disciplinaría que por disposición constitucional recae sobre este Tribunal Supremo. Art. V, Sec. 11 de la Constitución de Puerto Rico, LPRA Tomo I.

Bajo ningún concepto las evaluaciones negativas emitidas por la Comisión de Evaluación Judicial constituyen

de por sí una falta ética. Precisamente por ello es que la Regla 25 del vigente Reglamento para la Evaluación de Jueces y Juezas del Tribunal de Primera Instancia, In re Reglamento Evaluación Js. TPI, 199 DPR 904 (2018), establece que ante una evaluación negativa podría proceder el inicio de un procedimiento ético, con todas las garantías del debido proceso de ley, que incluye el derecho a que los cargos sean probados por prueba clara, robusta y convincente. In re Candelaria Rosa, supra, pág. 459; In re Salas Arana, supra, pág. 347. Es la OAT, como parte querellante, quien tiene la carga probatoria en los procesos éticos contra jueces.

Con la radicación de la querella de epígrafe, la OAT escogió hacer pública cierta información del contenido y resultado del proceso de evaluación judicial. No obstante, luego de que el juez Benero García solicitó descubrir prueba sobre ese proceso, fue la propia OAT quien solicitó y obtuvo una orden de protección que ordenó al Secretario de este Tribunal que sellara y reservara el informe de la Comisión de Evaluación Judicial como documento confidencial y no accesible al público. Posteriormente a la emisión de esa orden, la OAT no realizó trámite ulterior con ese informe, ni fue presentado en evidencia durante el trámite disciplinario. No puede pretender la OAT argumentar sobre el contenido de un documento que no se presentó en el proceso ético. Hace seis décadas dejamos claro que ningún "argumento es lícito si hace referencia a prueba que no fue admitida durante el juicio". Pueblo v. Fournier, 80 DPR 390, 409

(1958). Por tal razón, es correcta la determinación de la Comisión de Disciplina Judicial que desestimó el sexto cargo de la querella de epígrafe.

IV.

Luego de estudiar con rigor la prueba desfilada, las posturas de ambas partes, escuchar las grabaciones de las vistas judiciales en controversia y considerar la prueba pertinente, es ineludible concluir que la evidencia presentada por la OAT no demostró mediante prueba clara, robusta y convincente que el juez Benero García cometió los cargos imputados en violación de los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial, supra. La evidencia presentada no produjo en nosotros una convicción duradera de que se violentaran los Cánones de Ética Judicial, según requiere nuestro ordenamiento jurídico.

Aunque algunas de las actuaciones del juez Benero García sean desagradables para algunos, o hayan causado incomodidad en otros, eso no es de por sí una violación ética. De hecho, muchos incidentes se pudieron evitar con una supervisión administrativa más proactiva. Al igual que la Comisión de Disciplina Judicial, ante la falta de prueba clara, robusta y convincente, estamos imposibilitados de concluir que hubo alguna infracción de los Cánones de Ética Judicial que ameriten la imposición de una medida. Ante esta realidad, procede el archivo de esta Querella.

Parafraseando lo que expresamos en Oficina de Ética Gubernamental v. Rodríguez Martínez, 159 DPR 98, 130 (2003),

citando a _Oficina de Ética Gubernamental v. Cordero Santiago_, 154 DPR 827, 856 (2001), aunque en los últimos años hemos visto una cantidad considerable de casos éticos contra jueces en funciones, no debemos permitir que en el afán de buscar soluciones inmediatas, la OAT desvirtúe el proceso ético judicial, convirtiéndolo en un instrumento para cometer injusticias, dañar permanentemente la reputación de funcionarios públicos que han servido con dignidad, honradez y dedicación, y desalentar que las personas más capacitadas escojan dedicarse a la noble labor de impartir justicia. Véase, a manera de ejemplo, _In re Hon. Carballo Nogueras_, 198 DPR 739 (2017).

Nuestros jueces tienen que contar con la garantía de que pueden decidir lo que entiendan que procede en Derecho, sin temor a que por ello se les someta a acciones disciplinarias. Véase la Regla 3 de las Reglas de Disciplina Judicial, 4 LPRA Ap. XV-B.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. Jaime J. Benero García     AD-2016-0001

Conducta
Profesional

SENTENCIA

En San Juan, Puerto Rico, a 1 de mayo de 2019.

Por los fundamentos antes expuestos, en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, concluimos que la evidencia presentada por la OAT no demostró mediante prueba clara, robusta y convincente que el juez Benero García cometió los cargos imputados en violación de los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial, supra. Ante esta realidad, procede el archivo de esta Querella.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez, la Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Colón Pérez disienten con Opiniones Escritas. El Juez Asociado señor Estrella Martínez disintió y hace constar la expresión particular siguiente:

Disiento del dictamen que hoy emite este Tribunal, debido a que el patrón de conducta exhibido por el Hon. Jaime J. Benero García (juez Benero García) en su rol como juez evidentemente es constitutivo de violaciones crasas a los Cánones de Ética Judicial, 4 LPRA Ap. IV-B. Tal como reseña la extensa

Opinión Mayoritaria, el juez Benero García Humilló a una mujer embarazada mediante expresiones prejuiciadas y parcializadas debido al fundamento de que, según su percepción, aparentaba no tener hogar y ser usuaria de sustancias controladas.

Ello, a pesar de que la dama vertió para récord su dirección física y hasta la parte contraria acreditó que no le constaba que ésta fuera usuaria de sustancias controladas, lo cual tampoco daría autorización al Juez de brindarle el trato inhumano perpetuado en la grabación del procedimiento. Como cuestión de hecho, la querellante tuvo un parto prematuro a la semana siguiente de esa vista.

Asimismo, el juez Benero García utilizó la custodia de una menor como método de sanción y amenaza ante el incumplimiento de sus órdenes. Como agravante, intentó intimidar a un empleado de la Comisión de la Evaluación Judicial que acudió a su Sala para fines investigativos y legítimos.

Como puede apreciarse, el juez Benero García desplegó un repudiable patrón de comportamiento insensible, parcializado e irrespetuoso hacia los ciudadanos y ciudadanas que comparecían ante él. Un estudio minucioso de las cinco quejas presentadas y las grabaciones de los procedimientos ventilados ante el Juez revelan abrumadoramente mediante prueba clara, robusta y convincente que el juez Benero García abusó de su discreción judicial y demostró un pobre temperamento judicial. De esta forma, infringió su deber de ejercer sus labores con la prudencia, serenidad e imparcialidad que la envergadura de su puesto exige. Cánones 2, 8, 13 y 14 de Ética Judicial, 4 LPRA Ap. IV-B. Asimismo, incumplió con el llamado de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003 que requiere la prestación de "servicios de manera equitativa, sensible y con un enfoque humanista". 4 LPRA sec. 24a. Desafortunadamente, sus comentarios "imprudentes y carentes de sensibilidad tuvieron el efecto inescapable de menguar la confianza de la ciudadanía en la Rama Judicial". *In re Hon. Colón Colón*, 197 DPR 728, 745 (2017).

La severidad de la conducta ante nuestra consideración infringe los Cánones de Ética Judicial y lacera gravemente los pilares de respeto y confianza que exige la Rama Judicial. Ello, en claro detrimento de "la independencia judicial, la administración efectiva e imparcial

de la justicia y la confianza de la ciudadanía en un sistema de justicia". *In re Cancio González*, 190 DPR 290, 297 (2014). Por tales motivos, opino que el comportamiento reprochable y antiético del juez Benero García amerita nuestra intervención disciplinaria y que procede ser sancionado severamente conforme a la Regla 29 de Disciplina Judicial, 4 LPRA Ap. XV-B.


José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In Re:

Hon. Jaime J. Benero García        AD-2016-01

La Jueza Presidenta ORONOZ RODRÍGUEZ emitió una Opinión disidente

En San Juan, Puerto Rico, a 1 de mayo de 2019.

Nuevamente, una Mayoría condona la conducta de un Juez, a pesar de que esta contraviene los Cánones de Ética Judicial. La Opinión *Per Curiam*, lejos de absolver al Juez Jaime J. Benero García de violentar tajantemente la ética judicial, lo incrimina sin remedio al establecer un patrón de conducta que ratifica su falta de temperamento judicial, serenidad y sensibilidad. Los hechos descritos en la decisión mayoritaria debieron ser suficientes para expresar nuestro rechazo más enérgico a este tipo de conducta.

En síntesis, el Juez Benero García ordenó el arresto de la Sra. Yomarie Muriel Rodríguez, quien se encontraba en el séptimo mes de un embarazo de alto riesgo, por no pagar una deuda por concepto de pensión

alimentaria. Según la Opinión *Per Curiam*, tras ordenar el arresto el Juez "mostró preocupación por el estado de embarazo de la señora Muriel Rodríguez e impartió instrucciones dirigidas al Departamento de Corrección para que se le ofreciera toda la ayuda médica necesaria". Opinión *Per Curiam*, pág. 84. Al parecer, para una mayoría de los miembros de este Tribunal, es apropiado y permisible que un juez catalogue a una persona que acude a su sala como adicta y deambulante sin base alguna en el récord[1] y descanse en su apariencia física para llegar a esa conclusión. La Mayoría valida que el juez desplegara una conducta humillante, prejuiciada y discriminatoria disfrazada de una "preocupación". Peor aún, avala que se le dijera a esa persona que el bebé que llevaba en su vientre estaría mejor protegido en la Administración de Corrección que en la calle. Rechazo tal conclusión. Esta conducta es patentemente insensible y ofensiva. Lo que es más, se distancia del trato que espera la ciudadanía de sus jueces y, más aún, se aparta de las cualidades y el comportamiento que esperamos y exigimos de los miembros de nuestra judicatura.

En otra demostración de falta de temperamento judicial, el Juez Benero García emitió una orden de arresto contra la Sra. Nydia E. Rodríguez Santiago por no comparecer a una vista, a pesar de que su abogado llamó telefónicamente al tribunal durante la mañana para informar **que su hijo estaba en el hospital**, pero que en cuanto alguien lo relevara comparecería al Tribunal. Una vez ambos llegaron a la Sala, se arrestó a **la señora Rodríguez Santiago y se le tuvo toda la tarde encarcelada**. Una Mayoría de este Tribunal intenta justificar la conducta del Juez al indicar que

---

[1] Destaco que la representante legal de la señora Muriel Rodríguez indicó que a su entender esta no tenía ese problema y la parte contraria en el pleito expresó que ello no le constaba.

la otra parte solicitó que a la señora Rodríguez Santiago se le encontrara incursa en desacato por obstruir las relaciones paterno filiales. ¿Acaso los jueces estamos para adoptar los ruegos de una parte y conceder remedios sin calibrar y considerar las consecuencias e implicaciones de estos? Por otra parte, la determinación del juez que aquí se cuestiona no versa sobre una controversia relacionada al tema central de las relaciones paterno filiales y sus pormenores. El Juez Benero García ordenó el arresto de la señora Rodríguez Santiago, específicamente, **porque esta no acudió a la vista ese día.** Adoptó el curso de acción disponible más drástico, como lo es encarcelar a una ciudadana durante varias horas, a pesar de que el récord no reflejaba un historial de incomparecencias.[2]

La Mayoría también articula ~~como~~ defensa para ~~el~~ Juez la falta de notificación oportuna del retraso de la señora Rodríguez Santiago al Tribunal. Ello es inexplicable, pues el abogado de la señora Rodríguez Santiago, el Lcdo. Javier Pérez Rojas, solicitó y se le concedió un turno posterior por una situación personal.

La Opinión *Per Curiam* suma otra excusa para el comportamiento del Juez Benero García. Sostiene que no se le podía imputar el arresto, si este no había expedido la orden correspondiente. Los hechos derrotan esta contención. El Juez Benero García, y nadie más, emitió la orden de arresto. De hecho, previo al receso del almuerzo, la orden de arresto: se había reducido a escrito; el

---

[2] Este Tribunal ha expresado que "los jueces deben utilizar el desacato como última alternativa para vindicar la dignidad del tribunal, debido a que el uso indiscriminado de este instrumento equivaldría a una falta de temperamento judicial". In re Sierra Enríquez, 185 DPR 830, 849 (2012).

(continúa...)

Juez Benero García **la había firmado**; y el Juez Benero García la había remitido a la secretaría del tribunal para el trámite correspondiente.[3]

Otro incidente que demostró una falta de sensibilidad y templanza ocurrió en una vista en un caso de relaciones paterno filiales y alimentos. Según surge de la Opinión *Per Curiam*, la Sra. Leishla Cruz Rodríguez compareció a la vista sin su representación legal, quien no pudo asistir por problemas de salud. Aunque el Juez Benero García indicó inicialmente que la vista sería informativa, precisamente porque la señora Cruz Rodríguez estaba desprovista de representación legal, emitió una resolución mediante la cual ordenó que una menor implicada en el caso realizara un viaje de visita a su padre sin la compañía de la señora Cruz Rodríguez y dispuso que esta tendría que sufragar los gastos de un acompañante. Además, amenazó a la señora Cruz Rodríguez con celebrar una vista para entregar la custodia de la niña al padre si no cumplía con la orden.

De la minuta de esa vista surge que al tomar la determinación el Juez consideró factores ajenos al mejor bienestar del menor y, en cambio, concibió el asunto como una oportunidad para sancionar a la señora Cruz Rodríguez.[4] Posteriormente, el Tribunal de Apelaciones revocó esa determinación y devolvió el caso para que se celebrara un proceso justo y equitativo. Expresó que, "aun partiendo de que la peticionaria haya puesto obstáculos al establecimiento de relaciones paterno filiales en este caso, no

---

[3] Por ende, es inmaterial que el alguacil revelara que al momento de diligenciarla no la tenía, ya que, como se constató, el Juez Benero García efectivamente la firmó.

[4] Exhibit 10 de la Oficina de Administración de los Tribunales.

(continúa...)

podemos avalar que sea la menor quien pague el precio de las actuaciones de su progenitor".[5] A esos efectos, expuso que "la menor en la actualidad tiene 7 años de edad y ha vivido siempre con la peticionaria, quien es su madre biológica. No está familiarizada con el peticionario. Más aun, la niña a quien reconocía como padre era a otra persona que ya no está presente en el hogar. Todos estos son factores que deben ser abordados en la determinación que se tome sobre relaciones paterno filiales".[6]

Los incidentes que desgloso, los cuales surgen estrictamente de documentos judiciales que obran en los expedientes del tribunal, debieron ser suficientes para activar el Canon 3 de Ética Judicial, 4 LPRA Ap. IV-B, C. 3, que exige "[e]l debido desempeño de las funciones judiciales [lo cual] requiere que los miembros de la judicatura sean **competentes, sensibles, íntegros y diligentes**.[…] También deben desarrollar las cualidades personales necesarias para el correcto desempeño de sus obligaciones judiciales". Comentarios del Canon 3 de Ética Judicial, Íd.

A su vez, el Canon 8, 4 LPRA Ap. IV-B, C. 8, especifica que los Jueces y Juezas deben ser laboriosos, **prudentes, serenos e imparciales en el desempeño de sus funciones adjudicativas**. En contraste con ese fin, la muestra que reseño marca que el camino adjudicativo que ha recorrido el Juez Benero García se ha caracterizado por desplegar una conducta impropia y distante del temperamento exigido a todo juez y jueza. Ello se agrava, según establece la Opinión *Per Curiam*, cuando varios de estos incidentes ocurrieron mientras el Juez querellado atendía casos de relaciones

---

[5] Sentencia del Tribunal de Apelaciones, <u>Miguel A. Ramos v. Leishla Cruz Rodríguez</u>, KLCE201500409, pág. 18.
[6] <u>Íd.</u>, n. 12.

de familia. Los jueces y las juezas de las salas de familia se enfrentan diariamente a controversias complicadas que se caracterizan por la animosidad fuerte entre las partes. La carga emocional que conllevan estos casos exige que los jueces y juezas posean conocimiento especializado, pero a su vez, que desplieguen un gran sentido de humanismo, paciencia y sensibilidad. Es decir,

> Los asuntos que se atienden en nuestras salas de familia son, sin duda, particulares y, de ordinario, complicados. Sin embargo, las complicaciones a las que se enfrenta un juez de familia son, en un sentido, muy diferentes a las que se consideran en otras salas de justicia. Esto, porque distinto en gran manera a los asuntos que se atienden en otras ramas del Derecho, los casos de familia envuelven derechos que se enmarcan en profundas emociones y sentimientos, **que requieren del juez de familia, además de un fino conocimiento del Derecho, una gran sensibilidad humana y empatía.** Controversias que requieren del o la juez **la capacidad de mantener en todo tiempo el control de su caso, pero salvaguardando, a su vez, los derechos de las partes** que llegan a su sala buscando la mayoría de las veces, además de justicia, el desahogo de un torrente de emociones, muchas de ellas negativas. (…) Cuando, para completar el cuadro, en medio de ese barrunto de emociones y sentires yace el mejor bienestar de uno o más menores, **se requiere, además, del juez de familia, temple y sabiduría para escuchar a todos los recursos a su disposición, y actuar de manera firme pero sosegada.** Marchago Olivella v. Martínez Schmidt, 188 DPR 404, 414-415 (2013)(Opinión de conformidad emitida por el Juez Asociado señor Kolthoff Caraballo, a la cual se unieron la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Rivera García)(énfasis suplido).

Situaciones como las que reseñamos configuran violaciones patentes a la ética judicial, puesto que la razón de esta, es precisamente garantizar a la ciudadanía que comparece a las salas judiciales el respeto de sus derechos, de su dignidad, y la atención debida de sus reclamos dentro de un marco de decoro y de respeto.

Por otro lado, la Opinión *Per Curiam* provee varios ejemplos de circunstancias en las que el Juez Benero García recurrió excesivamente y de manera imprudente a la emisión de órdenes de

mostrar causa. En una ocasión, a pesar de conocer el conflicto de señalamientos que tenía el Lcdo. Carlos García Morales y que este no podía salir de la sala del Juez Toledo Reyna, el Juez Benero García expidió una orden de mostrar causa contra el licenciado y dispuso que se notificara personalmente. En consecuencia, la orden se diligenció al licenciado mientras postulaba en otra sala.[7]

Algo similar ocurrió con el Procurador de Menores, Lcdo. Carlos Alonso Sánchez, quien también tenía vistas simultáneas en salas diferentes. Este acudió a la sala del Juez Benero García para informarle al alguacil que la procuradora encargada de un caso para el cual el Juez señaló vista ese día estaba de vacaciones y que cualquiera de los otros dos procuradores atendería el señalamiento. Mientras esperaba, se tuvo que excusar porque lo procuraba otra juez y, mientras litigaba en esa sala, una procuradora le informó que lo estaban llamando de la sala del Juez Benero García. Sin embargo, no se le permitió salir debido a que la vista había comenzado. Ante esta situación, el Juez Benero García, emitió una orden de mostrar causa y ordenó su arresto, sin considerar la razonabilidad de ese curso de acción en las circunstancias implicadas.

De igual forma, la práctica del Juez Benero García de retener a los abogados hasta que dispusiera de los casos que estos tuvieran en su sala, independientemente del tiempo que ello tomara, entorpecía los procedimientos que se tramitaban ante otros jueces. Su comportamiento requirió la intervención de Jueces Administradores y Coordinadores quienes sostuvieron reuniones con

---

[7] En esta situación, el señalamiento en la sala del Juez Benero García era para una vista en sus méritos en un caso criminal. Asimismo, cabe destacar que antes de que comenzaran las vistas, el licenciado intentó remediar el conflicto entre ambos señalamientos.

el Juez para dialogar sobre este y otros asuntos relacionados. A pesar de ello, este rehusó modificar su conducta, lo que sin duda demostró su falta de colaboración y cooperación con sus compañeros jueces y juezas en la administración de la justicia.

Cabe destacar que, la Opinión *Per Curiam* señala que muchos de estos asuntos se debieron atender administrativamente. De entrada, se debe señalar que, el hecho de que una situación se pudo haber atendido de otra forma, no excusa las actuaciones del juez ni lo exime de responsabilidad. Por el contrario, considerar que los jueces podían intervenir administrativamente para atender el comportamiento del Juez Benero García constituye, en efecto, un reconocimiento de que había un mal manejo y una falla por parte del querellado. Pero, además de ello, sorprende que se trate de presentar el comportamiento del querellado como un aspecto de índole exclusivamente administrativa cuando los hechos que se reseñan en la Opinión *Per Curiam* claramente revelan que el comportamiento del Juez Benero García ocurrió al atender incidentes procesales ocurridos en su sala, cuyo control recae de manera exclusiva sobre el juez que la preside. La determinación de un juez de ordenar el arresto de un abogado que está atendiendo asuntos ante otro juez o jueza, de amenazarlo si no está en su sala a cierta hora, cual abusiva que sea, son determinaciones emitidas en el contexto de controversias procesales que, de ordinario, no se pueden dejar sin efecto administrativamente. Más aún, la posibilidad de que un Juez Administrador pueda o deba atender situaciones como las que motivan la queja contra el Juez Benero García no borra los hechos constitutivos de faltas al Código de Ética Judicial cuyo

procesamiento corresponde exclusivamente a la Comisión de Disciplina Judicial y, en última instancia, a este Foro.

Como si esto fuera poco, la Comisión de Evaluación Judicial le otorgó al Juez Benero García un "no calificado", calificación más baja que se le puede otorgar a un Juez, en no una, sino en dos ocasiones, hecho que no está en controversia. Al valorar este aspecto, la Opinión *Per Curiam* omite señalar que, por disposición de ley, los documentos que forman parte del expediente de la evaluación judicial son confidenciales. La OAT se vio en la disyuntiva de escoger entre presentar prueba en relación al sexto cargo, lo cual implicaba divulgar los testimonios que funcionarios, compañeros jueces y abogados ofrecieron bajo el manto de confidencialidad, o someter el cargo sin evidencia. Ante el desarrollo procesal del trámite disciplinario, surge que la OAT optó por no presentar la prueba, de manera que se salvaguardara la garantía de confidencialidad de los procesos de evaluación, sobre todo ante el hecho de que la calificación otorgada al Juez Benero García no estaba en controversia.

Estas son solo una muestra de cómo las conductas que asumió el Juez Benero García debieron activar,[8] por ejemplo, disposiciones tales como el Canon 13 que requiere que los jueces y juezas traten "con consideración y respeto" a los abogados(as), a testigos, jurados, funcionarias o funcionarios y a toda persona que comparezca ante el tribunal. 4 LPRA Ap. IV-B, C. 13. En cuanto a la conducta en los procedimientos judiciales, el Canon 14 dispone que "las juezas y los jueces mantendrán su conducta dentro de la debida propiedad y circunspección sin mostrar impaciencia o

---

[8] Destaco que algunos de esos incidentes que surgen de la Opinión *Per Curiam* contravienen otros Cánones de Ética Judicial, 4 LPRA Ap. IV-B, que no se discuten en esta Opinión Disidente.

**severidad excesivas**". 4 LPRA Ap. IV-B, C. 14. En esa medida, los jueces deben promover la consideración y el respeto, así como procurar un ambiente en el cual se preserve la dignidad del proceso y de todo ser humano que comparece ante el tribunal. Al no hacerlo, se hace caso omiso al llamado a los jueces y juezas a mantener el temperamento judicial y a no actuar ensoberbecidos de poder. In re Sierra Enríquez, 185 DPR 830, 859 (2012). Conviene mencionar que "[l]a codificación de las normas éticas, que rigen la conducta de un juez, es resultado consecuente con la aspiración de que los juzgadores lleven una conducta ejemplar que esté a la altura de la función que desempeñan". In re González Acevedo, 165 DPR 81, 93 (2005).

Queda claro, pues, que el marco legal disponible regula por demás las situaciones como las que reseña la Opinión *Per Curiam*, las cuales denotan una falta de cooperación y colaboración profesional que también contravienen al Canon 6 de Ética Judicial, 4 LPRA Ap. IV-B, C. 6.

En particular, dicho precepto ético dispone que "[l]as juezas y los jueces cooperarán entre sí para lograr la más eficiente administración de la justicia. Su conducta estará enmarcada en el respeto mutuo, la cordialidad y la colaboración profesional […]". Canon 6 de Ética Judicial, 4 LPRA Ap. IV-B, C. 6.

En síntesis, los incidentes que se reseñan llevan a la conclusión inevitable de que no se podía archivar la querella. En cambio, en cumplimiento con nuestro deber de promover la confianza en nuestro sistema de justicia, procedía imponer una sanción al Juez Benero García. Su comportamiento reiterado, avalado por la

prueba, debió ser suficiente para justificar sancionarlo.[9] Al archivar la querella en contra del Juez Benero García, no estamos a la altura de las expectativas de la ciudadanía que nos mira, y también nos juzga. Hoy, al mantener las manos afuera de un asunto que requería necesariamente nuestra intervención, le decimos que un juez puede actuar de esta forma. Lo que es más, le decimos que podrá servirse de este Tribunal para intentar justificar lo injustificable. Como no creo que la conducta probada en este caso sea aceptable en nuestra Rama Judicial, disiento.


                                    Hon. Maite D. Oronoz Rodríguez
                                           Jueza Presidenta

---

[9] **Cabe mencionar que la conducta del Juez Benero García en su sala llegó al extremo de intimidar a un investigador de la Comisión de Evaluación Judicial.**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| *In re* <br><br> Hon. Jaime J. Benero García | **Núm.** AD-2016-0001 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 1 de mayo de 2019.

Resulta inquietante la proclividad de la mayoría de mirar para un lado a la hora de sancionar a ciertos jueces. Véase *In re* González Rodríguez, 2018 TSPR 165; *In re* Hon. Colón Colón, 197 DPR 728 (2017); *In re* Hon. Carballo Nogueras, 198 DPR 739 (2017). En más de una ocasión, ante conducta claramente despreciable y reprochable que deshonra la toga, la mayoría opta por la "sanción" más indulgente y lenitiva.

En esta ocasión, luego de relatar en media resma de papel innumerables actuaciones e incidentes del Juez Benero García que reflejan, como poco, su hiriente falta de sensibilidad para con los marginados, los pobres y las mujeres, la mayoría archiva la Querella. Ya no tan solo es insensible el juez, sino esta Curia, que parece tiene dos varas para medir la conducta de los jueces.

Los jueces, todos los jueces -incluyendo a quienes nos sentamos en esta Curia- debemos recordar que nuestra fortaleza reside en nuestra autoridad moral. "Cuando en una profesión fallan los principios que deben inspirar la actuación de sus miembros, o cuando determinados profesionales no ajustan su conducta a tales cánones, sin que por otra parte, les sea llamada la atención en debida

forma por los propios órganos rectores de la profesión a que pertenecen, el desprestigio de la profesión comienza. Si de la profesión judicial se trata, de tanta carga en su proyección social y humana, ese camino de deterioro puede hacer a la sociedad víctima de las más perjudiciales -trágicas- consecuencias". Francisco Soto Nieto, Compromiso de Justicia, 1977, págs. 67-68.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

Hon. Jaime J. Benero García

AD-2016-1

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 1 de mayo de 2019.

Cónsono con lo que ha sido nuestro proceder en este tipo de caso, y estando ante un proceso disciplinario en extremo similar al evaluado por este Tribunal en *In re: Colón Colón*, 197 DPR 728 (2017), disentimos del curso de acción seguido por una mayoría de este Tribunal en la causa de epígrafe. Ello, por entender que la conducta desplegada por el juez Jaime J. Benero García en varios procesos judiciales que presidía en una de nuestras salas de relaciones de familia -- constitutiva de grave violación a los Cánones 1, 3, 4, 5, 6, 8, 9, 13 y 14 de Ética Judicial, 4 LPRA Ap. IV-B -- ameritaba que se le impusiera a éste las más severas de las sanciones disciplinarias, y no el archivo de la querella instada en su contra.

En armonía con lo señalado por la Jueza Presidenta Oronoz Rodríguez, la Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Estrella Martínez en sus expresiones

disidentes, consideramos que la conducta desplegada por el juez Benero García -- la cual se recoge con particular precisión en la Opinión Per Curiam que hoy emite este Tribunal, y la que estuvo carente de sentido común, respeto, tolerancia, compasión, tacto y paciencia hacia ciertos ciudadanos y ciudadanas que tocaron las puertas de nuestras salas de relaciones de familia en búsqueda de justicia -- es una muestra patente de su abstracción de la sociedad en que vive, defecto que lo torna incapaz para ejercer sus prerrogativas judiciales. Son conductas como las anteriormente descritas las que, sin lugar a dudas, socavan la fe y la confianza de la ciudadanía en la Rama Judicial y en los jueces y las juezas que la componen.

Recordemos aquí, como bien lo sentenció el Hon. Luis Rivera Román, en su escrito *El temperamento y la función judicial*, Revista Ley y Foro, Colegio de Abogados de Puerto Rico, Vol.1 (2009), que para promover en el ciudadano y la ciudadana fe y confianza en los tribunales se requiere que el juez o jueza, en el desempeño de su *función judicial*, refleje, entre otras cosas, las siguientes características:

(1) capacidad para lidiar, calmada y cortésmente, con abogados y fiscales, jurados, testigos, partes y funcionarios del tribunal;

(2) mente abierta para escuchar y evaluar todos los puntos de vista sin llegar a conclusiones a destiempo;

(3) serenidad y habilidad para el dialogo, pues cuando se trata de la conducta humana la certeza no es absoluta;

(4) humildad para cambiar de postura o reconsiderar cuando sea necesario;

(5) circunspección para leer detenidamente las circunstancias de un caso y luego adjudicarlo;

(6) previsión, es decir, conciencia del efecto que su decisión tendrá sobre otras personas o casos;

(7) ecuanimidad pero firmeza;

(8) seguridad en sus determinaciones sin creer que se tiene el monopolio de la verdad;

(9) tolerancia ante la provocación.

Como ya mencionamos, esas muestras de verdadero emperamento judicial no estuvieron, en reiteradas ocasiones, en nada presente en la conducta desplegada por el juez objeto del proceso disciplinario que nos ocupa. Por ello, disentimos.


Ángel Colón Pérez
Juez Asociado